# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 21, 2010

No. 09-10996

Lyle W. Cayce
Clerk

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellant

v.

MARK CUBAN,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case raises questions of the scope of liability under the misappropriation theory of insider trading. Taking a different view from our able district court brother of the allegations of the complaint, we are persuaded that the case should not have been dismissed under Fed. R. Civ. P. 9(b) and 12 and must proceed to discovery.

Mark Cuban is a well known entrepreneur and current owner of the Dallas Mavericks and Landmark theaters, among other businesses. The SEC brought

1

No. 09-10996

this suit against Cuban alleging he violated Section 17(a) of the Securities Act of 1933,[1] Section 10(b) of the Securities Exchange Act of 1934,[2] and Rule 10b-5[3] by trading in Mamma.com stock in breach of his duty to the CEO and Mamma.com—amounting to insider trading under the misappropriation theory of liability. The core allegation is that Cuban received confidential information from the CEO of Mamma.com, a Canadian search engine company in which Cuban was a large minority stakeholder, agreed to keep the information confidential, and acknowledged he could not trade on the information. The SEC alleges that, armed with the inside information regarding a private investment of public equity (PIPE) offering, Cuban sold his stake in the company in an effort to avoid losses from the inevitable fall in Mamma.com's share price when the offering was announced.

Cuban moved to dismiss the action under Rule 9(b) and 12(b)(6). The district court found that, at most, the complaint alleged an agreement to keep the information confidential, but did not include an agreement not to trade. Finding a simple confidentiality agreement to be insufficient to create a duty to disclose or abstain from trading under the securities laws, the court granted Cuban's motion to dismiss. The SEC appeals, arguing that a confidentiality agreement creates a duty to disclose or abstain and that, regardless, the confidentiality agreement alleged in the complaint also contained an agreement not to trade on the information and that agreement would create such a duty.

---

[1] 15 U.S.C. § 77q(a).

[2] 15 U.S.C. § 78j(b).

[3] 17 C.F.R. § 240.10b-5.

No. 09-10996

We review de novo the district court's dismissal for failure to state a claim under Rule 12(b)(6).[4] We accept "all well pleaded facts as true, viewing them in the light most favorable to the plaintiff."[5] The "'complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[6] "'Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'"[7]

The SEC alleges that Cuban's trading constituted insider trading and violated Section 10(b) of the Securities Exchange Act.[8] Section 10(b) makes it

> unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce or of the mails, or
> of any facility of any national securities exchange . . . [t]o use or
> employ, in connection with the purchase or sale of any security . . .
> any manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the Commission may
> prescribe as necessary or appropriate in the public interest or for

---

[4] *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 (5th Cir. 2009). As the district court noted, to the extent Cuban's arguments under Rule 9(b) are distinct from his Rule 12(b)(6) arguments, the complaint pleads facts with sufficient "particularity" and thus does not violate Rule 9(b). *See id.*

[5] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[6] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

[7] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205, (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[8] The parties agree the allegations under section 17(a) of the Securities Act are evaluated under the same legal standard as the section 10(b) claim.

No. 09-10996

the protection of investors.[9]

Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful to

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Supreme Court has interpreted section 10(b) to prohibit insider trading under two complementary theories, the "classical theory" and the "misappropriation theory."[10]

The classical theory of insider trading prohibits a "corporate insider" from trading on material nonpublic information obtained from his position within the corporation without disclosing the information. According to this theory, there exists "a relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation."[11] Trading on such confidential information qualifies as a 'deceptive device' under section 10(b) because by using that information for his own personal benefit, the corporate insider breaches his

---

[9] 15 U.S.C. § 78j.

[10] *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

[11] *Chiarella v. United States*, 445 U.S. 222, 228 (1980).

duty to the shareholders.[12]  The corporate insider is under a duty to "disclose or abstain"[13]—he must tell the shareholders of his knowledge and intention to trade or abstain from trading altogether.

There are at least two important variations of the classical theory of insider trading.  The first is that even an individual who does not qualify as a traditional insider may become a "temporary insider" if by entering "into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes."[14]  Thus underwriters, accountants, lawyers, or consultants are all considered corporate insiders when by virtue of their professional relationship with the corporation they are given access to confidential information.[15]  The second variation is that an individual who receives information from a corporate insider may be, but is not always, prohibited from trading on that information as a tippee.  "[T]he tippee's duty to disclose or abstain is derivative from that of the insider's duty" and the tippee's obligation arises "from his role as a participant after the fact in the insider's breach of a fiduciary duty."[16]  Crucially, "a tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee

---

[12] *Id.* at 227.

[13] *Id.*

[14] *Dirks v SEC*, 463 U.S. 646, 655 n.14 (1983).

[15] *Id.*

[16] *Id.* at 659 (internal quotation marks omitted).

knows or should know there has been a breach."[17]   The insider breaches his fiduciary duty when he receives a "direct or indirect personal benefit from the disclosure."[18]

Both the temporary-insider and tippee twists on the classical theory retain its core principle that the duty to disclose or abstain is derived from the corporate insider's duty to his shareholders.  The misappropriation theory does not rest on this duty.  It rather holds that a person violates section 10(b) "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."[19]  The Supreme Court first adopted this theory in *United States v. O'Hagan*.[20]  There, a lawyer traded the securities of a company his client was targeting for a takeover.  O'Hagan could not be liable under the classical theory as he owed no duty to the shareholders of the target company.  Nevertheless, the court found O'Hagan violated section 10(b).  The Court held that in trading the target company's securities, *O'Hagan* misappropriated the confidential information regarding the planned corporate takeover, breaching "a duty of trust and confidence" he owed to his law firm and client.[21]  Trading on such information "involves feigning fidelity to the source of information and thus utilizes a 'deceptive device' as

---

[17] *Id.* at 660.

[18] *Id.* at 663.

[19] *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).

[20] *Id.* at 650.

[21] *Id.* at 653.

required by section 10(b)."[22]  The Court stated that while there is "no general duty between all participants in market transactions to forgo actions based on material nonpublic information," the breach of a duty to the source of the information is sufficient to give rise to insider trading liability.[23]

While *O'Hagan* did not set the contours of a relationship of "trust and confidence" giving rise to the duty to disclose or abstain and misappropriation liability, we are tasked to determine whether Cuban had such a relationship with Mamma.com.  The SEC seeks to rely on Rule 10b5-2(b)(1), which states that a person has "a duty of trust and confidence" for purposes of misappropriation liability when that person "agrees to maintain information in confidence."[24]  In dismissing the case, the district court read the complaint to allege that Cuban agreed not to disclose any confidential information but did not agree not to trade, that such a confidentiality agreement was insufficient to create a duty to disclose or abstain from trading under the misappropriation theory, and that the SEC overstepped its authority under section 10(b) in issuing Rule 10b5-2(b)(1).  We differ from the district court in reading the complaint and need not reach the latter issues.

The complaint alleges that, in March 2004, Cuban acquired 600,000 shares, a 6.3% stake, of Mamma.com.  Later that spring, Mamma.com decided

---

[22] *Id*. at 660.

[23] *Id*. at 662.  Because the duty flows to the source of the information and not to shareholders "if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."  *O'Hagan*, 521 U.S. at 655.

[24] 17 C.F.R. § 240.10b5-2(b)(1).

No. 09-10996

to raise capital through a PIPE offering on the advice of the investment bank Merriman Curhan Ford & Co. At the end of June, at Merriman's suggestion, Mamma.com decided to invite Cuban to participate in the PIPE offering. "The CEO was instructed to contact Cuban and to preface the conversation by informing Cuban that he had confidential information to convey to him in order to make sure that Cuban understood—before the information was conveyed to him—that he would have to keep the information confidential."[25]

After getting in touch with Cuban on June 28, Mamma.com's CEO told Cuban he had confidential information for him and Cuban agreed to keep whatever information the CEO shared confidential. The CEO then told Cuban about the PIPE offering. Cuban became very upset "and said, among other things, that he did not like PIPEs because they dilute the existing shareholders."[26] "At the end of the call, Cuban told the CEO 'Well, now I'm screwed. I can't sell.'"[27]

The CEO told the company's executive chairman about the conversation with Cuban. The executive chairman sent an email to the other Mamma.com board members updating them on the PIPE offering. The executive chairman included:

> Today, after much discussion, [the CEO] spoke to Mark Cuban about this equity raise and whether or not he would be interested in participating. As anticipated he initially 'flew off the handle' and said he would sell his shares (recognizing that he was not able to do anything until we announce the equity) but then asked to see the

---

[25] Compl. at ¶ 12.

[26] Compl. at ¶ 14.

[27] *Id.*

8

terms and conditions which we have arranged for him to receive from one of the participating investor groups with which he has dealt in the past.

The CEO then sent Cuban a follow up email, writing "'[i]f you want more details about the private placement please contact . . . [Merriman].'"[28]

Cuban called the Merriman representative and they spoke for eight minutes. "During that call, the salesman supplied Cuban with additional confidential details about the PIPE. In response to Cuban's questions, the salesman told him that the PIPE was being sold at a discount to the market price and that the offering included other incentives for the PIPE investors."[29] It is a plausible inference that Cuban learned the off-market prices available to him and other PIPE participants.

With that information and one minute after speaking with the Merriman representative, Cuban called his broker and instructed him to sell his entire stake in the company. Cuban sold 10,000 shares during the evening of June 28, 2004, and the remainder during regular trading the next day.

That day, the executive chairman sent another email to the board, updating them on the previous day's discussions with Cuban, stating "we did speak to Mark Cuban ([the CEO] and, subsequently, our investment banker) to find out if he had any interest in participating to the extent of maintaining his interest. His answers were: he would not invest, he does not want the company to make acquisitions, he will sell his shares which he can not do until after we

---

[28] Compl. at ¶ 16 (alteration in original).

[29] Compl. at ¶ 17.

No. 09-10996

announce.'"[30]

After the markets closed on June 29, Mamma.com announced the PIPE offering.  The next day, Mamma.com's stock price fell 8.5% and continued to decline over the next week, eventually closing down 39% from the June 29 closing price.  By selling his shares when he did, Cuban avoided over $750,000 in losses.  Cuban notified the SEC that he had sold his stake in the company and publically stated that he sold his shares because Mamma.com "was conducting a PIPE, which issued shares at a discount to the prevailing market price and also would have caused his ownership position to be diluted."[31]

In reading the complaint to allege only an agreement of confidentiality, the court held that Cuban's statement that he was "screwed" because he "[could not] sell" "appears to express his belief, at least at that time, that it would be illegal for him to sell his Mamma.com shares based on the information the CEO provided."[32]  But the court stated that this statement "cannot reasonably be understood as an agreement not to sell based on the information."[33]  The court found "the complaint asserts no facts that reasonably suggest that the CEO intended to obtain from Cuban an agreement to refrain from trading on the information as opposed to an agreement merely to keep it confidential."[34]  Finally, the court stated that "the CEO's expectation that Cuban would not sell

---

[30] Compl. at ¶ 20 (alteration in original).

[31] Compl. at ¶ 25.

[32] *SEC v. Cuban*, 634 F. Supp. 2d 713, 728 (N.D. Tex. 2009).

[33] *Id.*

[34] *Id.*

No. 09-10996

was also insufficient" to allege any further agreement.[35]

Reading the complaint in the light most favorable to the SEC, we reach a different conclusion. In isolation, the statement "Well, now I'm screwed. I can't sell" can plausibly be read to express Cuban's view that learning the confidences regarding the PIPE forbade his selling his stock before the offering but to express no agreement not to do so. However, after Cuban expressed the view that he could not sell to the CEO, he gained access to the confidences of the PIPE offering. According to the complaint's recounting of the executive chairman's email to the board, during his short conversation with the CEO regarding the planned PIPE offering, Cuban requested the terms and conditions of the offering. Based on this request, the CEO sent Cuban a follow up email providing the contact information for Merriman. Cuban called the salesman, who told Cuban "that the PIPE was being sold at a discount to the market price and that the offering included other incentives for the PIPE investors."[36] Only after Cuban reached out to obtain this additional information, following the statement of his understanding that he could not sell, did Cuban contact his broker and sell his stake in the company.

The allegations, taken in their entirety, provide more than a plausible basis to find that the understanding between the CEO and Cuban was that he was not to trade, that it was more than a simple confidentiality agreement. By contacting the sales representative to obtain the pricing information, Cuban was able to evaluate his potential losses or gains from his decision to either participate or refrain from participating in the PIPE offering. It is at least

---

[35] *Id.*

[36] Compl. at ¶ 17.

11

plausible that each of the parties understood, if only implicitly, that Mamma.com would only provide the terms and conditions of the offering to Cuban for the purpose of evaluating whether he would participate in the offering, and that Cuban could not use the information for his own personal benefit.[37] It would require additional facts that have not been put before us for us to conclude that the parties could not plausibly have reached this shared understanding. Under Cuban's reading, he was allowed to trade on the information but prohibited from telling others—in effect providing him an exclusive license to trade on the material nonpublic information. Perhaps this was the understanding, or perhaps Cuban mislead the CEO regarding the timing of his sale in order to obtain a confidential look at the details of the PIPE. We say only that on this factually sparse record, it is at least equally plausible that all sides understood there was to be no trading before the PIPE.[38] That both Cuban and the CEO

---

[37] The parties dispute Mamma.com's motive in providing the information to Cuban. Cuban contends that the offering was already oversubscribed and that this demonstrates the sole purpose of the phone call was to prevent Cuban from trading ahead of the offering. We express no opinion on this factual dispute or the potential implications of Cuban's allegations if they are true. At the motion-to-dismiss stage we must view all the facts in light most favorable to the SEC and assume that Mamma.com had a legitimate reason for contacting Cuban.

[38] Such an arrangement would raise serious tipper/tippee liability concerns were it explicit. If the CEO knowingly gave Cuban material nonpublic information and arranged so he could trade on it, it would not be difficult for a court to infer that the CEO must have done so for some personal benefit—e.g., goodwill from a wealthy investor and large minority stakeholder. "A reputational benefit that translates into future earnings, a quid pro quo, or a gift to a trading friend or relative all could suffice to show the tipper personally benefitted." *SEC v. Yun*, 327 F.3d 1263, 1277 (11th Cir. 2003). This of course is not to suggest any such improprieties occurred;

No. 09-10996

expressed the belief that Cuban could not trade appears to reinforce the plausibility of this reading.[39]

Given the paucity of jurisprudence on the question of what constitutes a relationship of "trust and confidence" and the inherently fact-bound nature of determining whether such a duty exists, we decline to first determine or place our thumb on the scale in the district court's determination of its presence or to now draw the contours of any liability that it might bring, including the force of Rule 10b5-2(b)(1).[40] Rather, we VACATE the judgment dismissing the case and REMAND to the court of first instance for further proceedings including discovery, consideration of summary judgment, and trial, if reached.

---

rather, it simply reinforces the plausibility of the interpretation of the alleged facts as evidencing an understanding that the agreement included an agreement by Cuban not to trade.

[39] Compl. at ¶¶ 14 & 20.

[40] Nor must we reach the validity of Rule 10b5-2(b)(1).