PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3183
_____

UNITED STATES OF AMERICA

v.

TIMOTHY MCGEE,
                                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-12-cr-00236-001)
District Judge: Honorable Timothy J. Savage


_____

Argued on February 12, 2014

Before: CHAGARES, SHWARTZ and ALDISERT,
Circuit Judges

(Filed: August 14, 2014)

John C. Grugan, Esq.        (ARGUED)
Christine R. O'Neil, Esq.
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103
     Counsel for Appellant

Jay M. Feinschil, Esq.
433 Green Lane
Philadelphia, PA 19128-0000
     Counsel for Amicus Appellant

Zane D. Memeger, Esq.
Frank R. Costello, Jr., Esq.
Bernadette A. McKeon, Esq.    (ARGUED)
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
     Counsel for Appellee

_____

OPINION OF THE COURT
_____

ALDISERT, Circuit Judge.

Timothy McGee appeals his convictions for (1) securities fraud under the misappropriation theory of insider trading pursuant to 15 U.S.C. §§ 78j(b) and 78ff, and Securities and Exchange Commission ("SEC") Rules 10b-5 and 10b5-2(b)(2), and (2) perjury pursuant to 18 U.S.C.

2

§ 1621. McGee raises several issues on appeal. He first challenges his securities fraud conviction, arguing that Rule 10b5-2(b)(2) is invalid because it allows for misappropriation liability absent a fiduciary relationship between a misappropriator of inside information and its source. McGee contends also that there is insufficient evidence to sustain his convictions, and that the District Court exceeded its discretion in denying his motion for a new trial based on newly discovered evidence. For the reasons that follow, we will affirm.[1]

I.

Between June and July 2008, McGee obtained material nonpublic information about the impending sale of Philadelphia Consolidated Holding Corporation ("PHLY"), a publicly traded company, from Christopher Maguire, a PHLY insider. Before this information became public, McGee borrowed approximately $226,000 at 6.875% interest to partially finance the purchase of 10,750 PHLY shares. Shortly after the public announcement of PHLY's sale, McGee sold his shares, resulting in a $292,128 profit.

A financial advisor with more than twenty years of experience, McGee first met Maguire between 1999 and 2001 while attending Alcoholics Anonymous ("AA") meetings. AA is a fellowship of recovering alcoholics who share a desire to stop drinking. AA members are encouraged to seek

---

[1] The District Court for the Eastern District of Pennsylvania had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C § 1291. We review the facts in the "light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

3

support from other members in their efforts to stay sober. As a newcomer to AA, Maguire sought support from McGee, who shared similar interests and had successfully achieved sobriety for many years.

For the better part of a decade, McGee informally mentored Maguire in AA. Though the two biked and competed in triathlons together, sobriety was "the primary purpose" of their relationship. J.A. 109-110. To achieve this purpose, they shared intimate details about their lives to alleviate stress and prevent relapses. Given the sensitive nature of their communications, McGee assured Maguire that their conversations were going to remain private. Likewise, Maguire never repeated information that McGee entrusted to him. This comported to the general practice in AA, where a "newcomer can turn . . . with the assurance that no newfound friends will violate confidences relating to his or her drinking problem." Amicus Curiae Br. Supporting Appellant at 12 (quoting Alcoholics Anonymous World Servs., Inc., 44 Questions 11 (2008)). McGee encouraged Maguire to use his services as an investment adviser, telling Maguire, "I know everything about what you're going through from an alcohol perspective. You can keep your trust in me." J.A. 112. Maguire repeatedly declined McGee's offers.

In early 2008, Maguire was closely involved in negotiations to sell PHLY. During this time, Maguire experienced sporadic alcohol relapses, culminating in a drinking episode a week or two after June 21-22, 2008 at a weekend golf event. Shortly after the golf event, Maguire recommenced his regular AA attendance. McGee saw Maguire after a meeting and inquired about his frequent absences. In response, Maguire "blurted out" the inside

4

information about PHLY's imminent sale. J.A. 133. He told McGee, "Listen, we're selling the company. . . . for three times book [value]. We are selling it for 61.50. [T]here's a lot of pressure. There's just a lot of things going on, and I'm not dealing with it well." J.A. 133. He testified that he expected McGee to keep this information confidential. At the time, the sale had not been publicly announced and Maguire "had not said a word to anybody." J.A. 135. He believed he could trust McGee with the information given their long history of sharing confidences related to sobriety.

After this conversation, McGee purchased a substantial amount of PHLY stock on borrowed funds without disclosing to Maguire his intent to use the inside information:

> On June 30, 2008, PHLY stock represented one-tenth of McGee's stock portfolio. Less than a month later, it constituted 60% of his holdings. In the interim period, McGee made the following purchases: July 15, 2008, 1,000 shares at $33 per share; July 17, 2008, 8,250 shares at $33 per share; July 18, 2008, 1,000 shares at $34 per share; and July 22, 2008, 500 shares at $35 per share. On July 23, 2008, after the announcement of the sale, the stock price rose to $58 per share. . . . To finance his purchase of the 8,250 shares on July 17, 2008, he borrowed approximately $226,000, at 6.875% interest.

United States v. McGee, 955 F. Supp. 2d 466, 472 (E.D. Pa. 2013) (footnotes omitted).

Shortly after the sale was publicly announced, the SEC commenced an investigation into McGee's unusually high

5

volume of trades in PHLY stock. On September 16, 2009, McGee gave sworn testimony before the SEC stating that he "knew nothing" about the impending sale of PHLY before he purchased the stock in July 2008. J.A. 53-54, 1630-1633. On May 10, 2012, a grand jury returned a two-count indictment charging McGee with (1) securities fraud under the misappropriation theory of insider trading in violation of § 10(b) of the Securities Exchange Act of 1934, SEC Rules 10b-5 and 10b5-2(b)(1)-(2), and (2) perjury in violation of 18 U.S.C. § 1621. McGee moved to dismiss the indictment contending that Rule 10b5-2(b)(1)-(2) is invalid. He argued that the rule conflicts with Supreme Court precedent because it allows for misappropriation liability absent a fiduciary relationship between a misappropriator and his source. The District Court denied his motion, holding that Supreme Court precedent does not conflict with or unambiguously foreclose Rule 10b5-2(b)(1)-(2).

On November 15, 2012, a jury found McGee guilty of both counts. As to the securities fraud count, the jury found that his trades violated a relationship of trust or confidence with Maguire based on their "history, pattern, or practice of sharing confidences" pursuant to Rule 10b5-2(b)(2).[2] 17 C.F.R. § 240.10b5-2(b)(2). McGee moved for a judgment of acquittal or a new trial, challenging the sufficiency of the evidence as to both convictions. He filed also a supplemental motion for a new trial based on newly discovered evidence. The District Court denied both motions. McGee timely appeals.

---

[2] Although the indictment charged McGee under both subsections (b)(1) and (b)(2), the District Court only instructed the jury as to subsection (b)(2). J.A. 446-450.

McGee renews his arguments on appeal, first contending that Rule 10b5-2(b)(2) exceeds the SEC's rulemaking authority under § 10(b). Second, he argues that there is insufficient evidence to support his convictions for securities fraud and perjury. Finally, he argues that the District Court exceeded its discretion in denying his motion for a new trial based on newly discovered evidence. We will address each argument in turn. Because we determine none to be persuasive, we will affirm.

## II.
## A.

To determine whether Rule 10b5-2(b)(2) exceeds the SEC's rulemaking authority, we begin with the language of the enabling statute. Section 10(b) of the Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> . . .
>
> (b) [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (emphasis added). The SEC acted on this broad delegation of rulemaking authority by promulgating Rule 10b-5, which makes it unlawful for any person, in connection with the purchase or sale of any security, to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. The Supreme Court has recognized two complementary theories of insider trading liability under § 10(b) and Rule 10b-5: the "traditional" and "misappropriation" theories.

Traditional insider trading occurs "when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." United States v. O'Hagan, 521 U.S. 642, 651-652 (1997). Such trading constitutes a deceptive device under § 10(b) because the insider violates a "relationship of trust and confidence" with his shareholders by trading on nonpublic information learned as a company insider. Chiarella v. United States, 445 U.S. 222, 228 (1980). The insider's position imposes a duty to either abstain from trading or disclose the inside information to the investors with whom he trades. Id.

In contrast, misappropriation focuses on deceptive trading by outsiders who owe no duty to shareholders. It occurs when a person "misappropriates confidential information for securities trading purposes, in breach of a duty [to disclose] owed to the source of the information." O'Hagan, 521 U.S. at 652 (emphasis added). If the trader discloses to the source his intent to trade, there is no deception and no § 10(b) liability. Id. at 655. The Court first recognized the misappropriation theory in O'Hagan, in which

8

a lawyer traded in a company's securities after learning that his firm's client was planning a takeover of the company. 521 U.S. at 652. Because he was an outsider to the target company, the lawyer could not be liable for traditional insider trading. Id. at 653 n.5. He could nevertheless be held liable for misappropriation because he violated a duty to disclose to his client and firm, the sources of the information. Id. at 655, 659.

Deception through nondisclosure, therefore, is the crux of insider trading liability. Id. at 654. In two seminal traditional insider trading cases, the Supreme Court rejected what is known as the parity-of-information rule, which would impose "a general duty between all participants in market transactions to forgo actions based on material, nonpublic information." Chiarella, 445 U.S. at 233; see also Dirks v. SEC, 463 U.S. 646, 657 (1983).[3] These cases emphasized that a duty to disclose is premised on "a specific relationship between two parties" rather than on the mere possession of inside information. Chiarella, 445 U.S. at 233; Dirks, 463 U.S. at 657-658. Accordingly, under either theory, "there can be no fraud absent a duty to speak," and the duty to speak

---

[3] In Chiarella, the Court reversed the conviction of a print-shop employee who traded securities of takeover targets he deduced from print materials because he did not share a fiduciary or similar relationship with the targets' shareholders. 445 U.S. at 224-225, 235. Similarly, in Dirks, an investment analyst was not liable for tipping his clients about a company's fraud because "[t]here was no expectation by [the analyst's inside] sources that he would keep their information in confidence." 463 U.S. at 665.

9

arises from a "relationship of trust and confidence." <u>Chiarella</u>, 445 U.S. at 230, 235.

The Supreme Court has provided limited guidance on which relationships between a trader and his source give rise to a duty to disclose for misappropriation. In <u>O'Hagan</u>, the Court suggested that only "recognized dut[ies]" will suffice. 521 U.S. at 666. However, the Court did not otherwise limit or define the contours of such relationships. <u>See</u> <u>id.</u> at 652-655; <u>SEC v. Cuban</u>, 620 F.3d 551, 555 (5th Cir. 2010). Accordingly, after <u>O'Hagan</u>, it remained unclear which nonfiduciary relationships carried a duty to disclose to the source. <u>SEC v. Yun</u>, 327 F.3d 1263, 1271 (11th Cir. 2003). Prompted by inconsistent treatment among lower courts,[4] the SEC promulgated Rule 10b5-2 "to clarify and enhance" the misappropriation theory in light of <u>O'Hagan</u>. Proposed Rule, Selective Disclosure and Insider Trading, 64 Fed. Reg. 72,590, 72,590 (proposed Dec. 28, 1999) [hereinafter Proposed Rule] (codified as amended at 17 C.F.R. § 240.10b5-2). Rule 10b5-2 identifies three nonexhaustive categories of relationships that give rise to a duty to disclose for misappropriation liability:

---

[4] <u>Compare</u> <u>United States v. Kim</u>, 184 F. Supp. 2d 1006 (N.D. Cal. 2002) (holding that there was no duty of confidentiality between members of a social group of CEOs although club rules emphasized a need for confidentiality), <u>with</u> <u>SEC v. Kirch</u>, 263 F. Supp. 2d 1144 (N.D. Ill. 2003) (holding such duties existed between members of a group of software executives because the need for confidentiality was understood).

[A] "duty of trust or confidence" exists in the following circumstances, among others:

(1) Whenever a person agrees to maintain information in confidence;

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality; or

(3) Whenever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling; provided, however, that the person receiving or obtaining the information may demonstrate that no duty of trust or confidence existed with respect to the information . . . .

17 C.F.R. § 240.10b5-2(b).

Because McGee's conviction stems only from subsection (b)(2), we will discuss solely that portion of the rule. As a matter of first impression, we decide whether Rule 10b5-2(b)(2) exceeds the SEC's rulemaking authority under § 10(b).

B.

11

We exercise plenary review over the District Court's legal conclusions. United States v. Huet, 665 F.3d 588, 594 (3d Cir. 2012). We review the validity of Rule 10b5-2(b)(2) under the familiar two-step Chevron deference framework. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984). At step one, we ask if "the [enabling] statute is silent or ambiguous" on "the precise question at issue." Id. at 843. If we answer in the affirmative, we turn to step two and uphold the rule if it is "based on a permissible construction of the statute." Id.

The Supreme Court has clarified that a "prior judicial construction of a statute trumps [a later] agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982 (2005). We thereby "hold judicial interpretations contained in precedents to the same demanding Chevron step one standard that applies if the court is reviewing the agency's construction on a blank slate." Id.

McGee argues that we are foreclosed from applying the teachings of Chevron to Rule 10b5-2(b)(2). He first contends that § 10(b) unambiguously requires deception. McGee then argues that, under Supreme Court precedent, deception through nondisclosure requires the breach of a fiduciary duty, leaving no room for Rule 10b5-2(b)(2). We disagree and hold that Rule 10b5-2(b)(2) is valid and entitled to Chevron deference because it (1) has not been congressionally or judicially foreclosed, and (2) is based on a permissible reading of § 10(b). We address each step in turn.

12

1.

At Chevron step one, we decide that § 10(b) is ambiguous and expressly delegates broad rulemaking authority to the SEC. Section 10(b) acts as a catch-all provision and authorizes the SEC to "prescribe [regulations] as necessary or appropriate" to prevent the use of "manipulative or deceptive device[s]" in connection with trading securities. 15 U.S.C. § 78j(b). McGee's contention that § 10(b) "unambiguously requires deception" misses the point. Appellant's Br. at 25. The statute is ambiguous because Congress declined to define the amorphous term "deceptive device." Moreover, Congress did not speak to the "precise question at issue" because § 10(b) does not mention insider trading at all, much less misappropriation or relationships required for liability. This congressional omission constitutes a delegation of authority to the SEC to "fill the statutory gap in reasonable fashion." Brand X, 545 U.S. at 980. The SEC filled this gap with Rule 10b5-2.

Having identified the gap in § 10(b), we turn to McGee's argument that Supreme Court precedent forecloses us from applying Chevron's framework to Rule 10b5-2(b)(2). We do not accept this argument. The Court has recognized that "allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute . . . would allow a court's interpretation to override an agency's." Id. at 982. "Chevron's premise is that it is for agencies, not courts, to fill statutory gaps." Id. Hence, it bears reemphasis that "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency

13

construction." Id. at 982-983. Our review of insider trading case law reveals no such authority.

First, we reject McGee's contention that Rule 10b5-2(b)(2) conflicts with the Supreme Court's insider trading jurisprudence. According to McGee, O'Hagan expressly requires a fiduciary relationship between a misappropriator and the source of inside information for liability.[5] McGee further argues that O'Hagan cannot be read in a vacuum, but is constrained by virtue of the Court's earlier traditional insider trading cases. McGee contends that Chiarella and its progeny require a fiduciary relationship for both theories of § 10(b) nondisclosure liability. Because Rule 10b5-2(b)(2) requires only a "history, pattern, or practice of sharing confidences," McGee argues that it impermissibly expands the Supreme Court's insider trading doctrine. We are unpersuaded.

Contrary to McGee's contention, Supreme Court precedent does not unequivocally require a fiduciary duty for all § 10(b) nondisclosure liability. In O'Hagan, though the defendant's duty to disclose undoubtedly arose from his position as a fiduciary, the Court stressed that misappropriation liability extends to "those who breach a recognized duty." 521 U.S. at 645, 666. The Court did not

---

[5] In McGee's motion to dismiss the indictment, he conceded that O'Hagan "did not elaborate on the requisite relationship giving rise to the duty and deception." United States v. McGee, 892 F. Supp. 2d 726, 732 (E.D. Pa. 2012) (quoting McGee Mem. at 6). On appeal, McGee changes course, insisting that O'Hagan requires a fiduciary duty.

14

unambiguously define recognized duties or cabin such duties to fiduciary relationships. The Court painted with a broader brush, referring to the requisite relationship as a "fiduciary or other similar relationship," an "agency or other fiduciary relationship," a "duty of loyalty and confidentiality," and a "duty of trust and confidence." <u>See</u> <u>id.</u> at 652-661 (citations omitted). We will not assign a meaning to "recognized dut[ies]" that the Court did not acknowledge. We therefore perceive no conflict between <u>O'Hagan</u>'s language and Rule 10b5-2(b)(2).

The Supreme Court's traditional insider trading precedent does not change this result. <u>Chiarella</u> and <u>Dirks</u> call for a "specific relationship between two parties." <u>Chiarella</u>, 445 U.S. at 233; <u>Dirks</u>, 463 U.S. at 657-658. Although these cases often referred to fiduciaries, they spoke also in broader terms. <u>See</u> <u>Dirks</u>, 463 U.S. at 654 (explaining that for traditional insider trading, there is no duty to disclose if the trader is not an agent, a fiduciary, <u>or</u> "a person in whom the sellers [of the securities] had placed their trust and confidence" (quoting <u>Chiarella</u>, 445 U.S. at 232)). Even assuming arguendo that <u>Chiarella</u> and <u>Dirks</u> require a strict fiduciary duty for traditional insider trading, neither case considered the misappropriation theory. In <u>O'Hagan</u>, the Court examined these cases and opted to extend misappropriation beyond solely fiduciaries. 521 U.S. at 645, 666. We decline to infer from <u>Chiarella</u> and <u>Dirks</u> a restriction on misappropriation that the <u>O'Hagan</u> Court did not itself recognize.

We join our sister circuits in recognizing that the Supreme Court "did not set the contours of a relationship of 'trust and confidence' giving rise to the duty to disclose or

15

abstain and misappropriation liability." <u>Cuban</u>, 620 F.3d at 555; <u>see also</u> <u>Yun</u>, 327 F.3d at 1271 (acknowledging that after <u>O'Hagan</u> and before Rule 10b5-2 "it [was] unsettled whether non-business relationships . . . provide the duty of loyalty and confidentiality necessary to satisfy the misappropriation theory"). Accordingly, the imposition of a duty to disclose under Rule 10b5-2(b)(2) when parties have a history, pattern or practice of sharing confidences does not conflict with Supreme Court precedent.[6]

Moreover, even if the rule were to conflict with the Court's interpretation of deceptive devices, the Court "did not purport to adopt or apply the unambiguous meaning" of § 10. <u>See</u> <u>Swallows Holding, Ltd. v. Comm'r</u>, 515 F.3d 162, 170 n.11 (3d Cir. 2008); <u>Brand X</u>, 545 U.S. at 982 (holding that to foreclose a conflicting agency interpretation, a "prior court

---

[6] We recognize that some courts have more narrowly defined duty-bearing relationships than others. Before <u>O'Hagan</u>, the Court of Appeals for the Second Circuit held that misappropriation requires a fiduciary relationship or its "functional equivalent," which the court narrowly defined as a relationship sharing "the essential characteristics of a fiduciary association." <u>United States v. Chestman</u>, 947 F.2d 551, 568 (2d Cir. 1991) (en banc, 5-4 decision). However, after <u>O'Hagan</u>, both the SEC and the Court of Appeals for the Eleventh Circuit explicitly rejected <u>Chestman</u>'s narrow holding because it did not "sufficiently protect investors," Proposed Rule, 64 Fed. Reg. at 72,602, and it "too narrowly defined the circumstances in which a duty . . . is created," <u>Yun</u>, 327 F.3d at 1272. As we hold here, deference is owed to the SEC's interpretation.

16

decision [must hold] that its construction follows from the unambiguous terms of the statute"). Indeed, the Supreme Court has recognized that the text of § 10(b) is ambiguous. See, e.g., Chiarella, 445 U.S. at 226 ("[Section] 10(b) does not state whether [or when] silence may constitute a manipulative or deceptive device. . . . [and] neither the legislative history nor the statute itself affords specific guidance . . . ."). In short, the Supreme Court simply has not held that misappropriation requires a fiduciary relationship or that its interpretation follows from the unambiguous terms of § 10(b).[7] Accordingly, we turn to step two of Chevron.

2.

"Under step two of the Chevron framework, we consider whether the [SEC's] interpretation is reasonable in light of the language, policies, and legislative history" of § 10(b) and the Exchange Act of 1934 as a whole. GenOn REMA, LLC v. EPA, 722 F.3d 513, 522 (3d Cir. 2013)

---

[7] McGee's reliance on United States v. Home Concrete & Supply, LLC, 132 S. Ct. 1836 (2012), is also misplaced. There, an agency's interpretation of an ambiguous I.R.C. provision was not entitled to Chevron deference when a prior court had determined that Congress's intent was clear and "decided the question definitively, leaving no room for the agency." Id. at 1844. In contrast, O'Hagan did not definitively decide the question of relationships bearing a duty to disclose, leaving no room for the SEC. Unlike the I.R.C. provision in Home Concrete, § 10(b) and its legislative history demonstrate that the statute is flexible by design. S. Rep. 73-792, at 5 (1934) ("[S]o delicate a mechanism as the modern stock exchange cannot be regulated efficiently under a rigid statutory program.").

(citation omitted). We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached." Chevron, 467 U.S. at 843 n.11. "Rules represent important policy decisions, and should not be disturbed if 'this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute . . . .'" Swallows, 515 F.3d at 171 (quoting Chevron, 467 U.S. at 845). We are mindful that § 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." SEC v. Zandford, 535 U.S. 813, 819 (2002) (internal quotation marks and citation omitted).

Here, Congress implemented the Exchange Act "to insure the maintenance of fair and honest markets in [securities] transactions." 15 U.S.C. § 78b. The legislative history demonstrates that § 10(b) was aimed at "any . . . manipulative or deceptive practices which [the SEC] finds detrimental to the interests of the investor." S. Rep. No. 73-792, at 18 (1934) (emphasis added). Rule 10b5-2(b)(2) targets a misappropriator who deceives his source by trading on confidential information notwithstanding the parties' "history, pattern, or practice of sharing confidences." 17 C.F.R. § 240.10b5-2(b). The SEC explained "that in some circumstances a past pattern of conduct between two parties will lead to a legitimate, reasonable expectation of confidentiality on the part of the confiding person." Proposed Rule, 64 Fed. Reg. at 72,603.

We agree with the analysis in United States v. Corbin, which held that the SEC's broader approach was reasonable and "buttressed by a thorough and careful

18

consideration . . . of the ends of § 10(b), the state of the current insider trading case law" and "the need to protect investors and the market." 729 F. Supp. 2d 607, 619 (S.D.N.Y. 2010). Like misappropriation generally, subsection (b)(2) "trains on conduct involving manipulation or deception" and proscribes "feigning fidelity to the source of the information." See O'Hagan, 521 U.S. at 655. A trader's "undisclosed, self-serving use," id. at 652, of confidential information notwithstanding the parties' history of sharing confidences chills market participation because it "'stems from contrivance, not luck,' and the informational disadvantage to other investors 'cannot be overcome with research or skill.'" Proposed Rule, 64 Fed. Reg. at 72,603 (quoting O'Hagan, 521 U.S. at 658-659). Rule 10b5-2(b)(2) provides a basis to hold such misappropriators accountable. Subsection (b)(2) thus is "well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." See O'Hagan, 521 U.S. at 658 (citation omitted).[8]

---

[8] The SEC was emboldened by Congress's enactment of "two separate laws providing enhanced penalties for insider trading," which the SEC viewed as an endorsement of its regulatory efforts. Proposed Rule, 64 Fed. Reg. at 72,599-72,600 (citations omitted). Likewise, we note that Rule 10b5-2(b)(2) has been in effect since October 23, 2000. See Final Rule, Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,716 (codified at 17 C.F.R. § 240.10b5-2(b)). In the intervening time, Congress has not altered the SEC's interpretation.

We believe that Rule 10b5-2(b)(2) is based on a permissible reading of "deceptive device[s]" under § 10(b). Although we are not without reservations concerning the breadth of misappropriation under Rule 105b-2(b)(2), it is for Congress to limit its delegation of authority to the SEC or to limit misappropriation by statute. It is not the role of our Court, "even if the agency's reading differs from what the court believes is the best statutory interpretation." See Brand X, 545 U.S. at 980.[9]

## C.

We hold that Rule 10b5-2(b)(2) is a valid exercise of the SEC's rulemaking authority. The rule is owed Chevron deference because it has not been congressionally or judicially foreclosed and is "based on a permissible reading" of § 10(b).

## III.

McGee argues also that the District Court erred by denying his motion for a judgment of acquittal or a new trial because insufficient evidence supports his convictions for securities fraud and perjury. Our review of the sufficiency of the evidence is "highly deferential." United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The verdict must be upheld if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

---

[9] Like the Court in O'Hagan, we are reassured by the added protection for criminal liability under § 10(b), which requires that misappropriators knowingly and willfully violate the law. 521 U.S. at 665-666.

of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (emphasis in original).

## A.

McGee first challenges his securities fraud conviction. He argues that no rational trier of fact could have found that (1) McGee and Maguire had the requisite relationship of trust or confidence for misappropriation liability, or (2) the inside information was disclosed within the scope of such a relationship. But McGee cannot overcome the "highly deferential" standard of review for sufficiency of the evidence. <u>Caraballo-Rodriguez</u>, 726 F.3d at 430.

A person is liable for misappropriation when he "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." <u>O'Hagan</u>, 521 U.S. at 652. Under Rule 10b5-2(b)(2), a duty to disclose to the source exists when there is a "history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know" that the person communicating the information expects it to be kept confidential. 17 C.F.R. § 240.10b5-2(b)(2). The SEC explicitly rejected limiting liability to those who share "business confidences." Proposed Rule, 64 Fed. Reg. at 72,603. The SEC instead favored a facts-and-circumstances test and noted that the type of confidences historically shared between parties could be a relevant factor. <u>Id.</u>[10]

---

[10] Because we owe deference to the rule as codified, we reject McGee's argument that a business relationship is required for misappropriation.

21

We reject McGee's argument that he did not share a relationship of trust or confidence with Maguire. McGee contends that membership in AA alone does not generate a duty of trust or confidence and his relationship with Maguire did not bear the hallmark indicators of a confidential relationship. McGee characterizes their relationship as purely social, limited to "occasional bike rides and sporadic AA meetings." Appellant's Br. at 31, 35. He argues this social affiliation is insufficient to impose a duty to disclose under Rule 10b5-2(b)(2). We disagree.

Even assuming there is no expectation of confidentiality generally in AA,[11] the plain language of Rule 10b5-2(b)(2) requires a "history, pattern, or practice of sharing confidences" between the two parties. 17 C.F.R. § 240.10b5-2(b)(2). Sufficient evidence supports the jury's

---

[11] Amicus on behalf of McGee cites an exposition published by AA's General Service Office for the proposition that AA is premised on the "anonymity" of its members and not "confidentiality." Amicus Curiae Br. Supporting Appellant at 12-13. But the AA materials cited by Amicus include broader language. Amicus cites to an AA publication stating that a "newcomer can turn to A.A. with the assurance that no newfound friends will violate confidences relating to his or her drinking problem." Id. at 12 (citation omitted) (emphasis added). This language is not limited to a member's anonymity. Moreover, evidence at trial indicated that AA members were cautioned that "what you hear here, stays here." J.A. 111. Although this undermines McGee's argument, a finding that AA requires confidentiality is not necessary to our holding.

finding that such a pattern existed. For almost a decade, McGee informally mentored Maguire, who entrusted "extremely personal" information to McGee to alleviate stress associated with alcohol relapses. J.A. 109-110. Confidentiality was not just Maguire's unilateral hope; it was the parties' expectation. It was their "understanding" that information discussed would not be disclosed or used by either party. J.A. 112. Maguire never repeated information that McGee revealed to him and McGee assured Maguire that their discussions were going to remain private. Furthermore, McGee encouraged Maguire to use his services as an investment adviser, telling Maguire, "I know everything about what you're going through from an alcohol perspective. You can keep your trust in me." J.A. 112. From this evidence, a rational juror could find that a relationship of trust or confidence existed based on the parties' history, pattern or practice of sharing confidences related to sobriety.

We reject also McGee's argument that the inside information about PHLY's sale exceeded the scope of any confidential relationship related to sobriety. Shortly following Maguire's relapse, McGee saw him at an AA meeting. After the meeting, McGee asked Maguire about his inconsistent AA attendance. In response, Maguire told McGee, his confidant, that the impending sale of PHLY was a source of high stress and that he was not dealing well with the pressure. McGee, a savvy investment advisor, feigned fidelity to Maguire and did not disclose his intent to use the information to his pecuniary advantage by trading in PHLY. Accordingly, McGee's inquiry and Maguire's disclosure of PHLY's impending sale related directly to their confidential relationship.

23

Ultimately, we agree with the District Court, which held that "[t]here was sufficient evidence from which a rational fact finder could have found that a confidential relationship existed and the inside information was disclosed within the confines of that relationship." McGee, 955 F. Supp. 2d at 470. Accordingly, we will affirm McGee's conviction for securities fraud.

## B.

McGee next challenges his perjury conviction under 18 U.S.C. § 1621 based on his sworn testimony on September 16, 2009 before the SEC. Under oath, McGee denied knowing any information about the sale of PHLY before he purchased the company's stock in July 2008.[12] McGee

---

[12] The charge in the indictment recited the following colloquy regarding McGee's perjury charge:

> Q: [SEC attorney] Did you have any information prior to making your purchases in Philadelphia Consolidated in July of '08 that there might be something afoot at the company, that there might be something happening with the stock?
> A: [McGee] No.
> Q: You didn't get a feeling from anyone that there was some activity, maybe [PHLY executives] weren't at a certain event that they were always at and you thought something might be going on, that they were busy?
> A: No, there was nothing like that. . . .
> Q: Any other events that you recall in let's say—beginning in maybe March of '08 going forward?
> A: March of '08?
> Q: Anything from that time forward till you bought?
> A: No.

contends that his perjury conviction must be overturned because (1) Maguire's testimony was uncorroborated and (2) there was insufficient evidence that McGee's statements were false. We find neither argument to be persuasive.

---

> Q: How about any contacts, do you recall having any conversations or contacts with [PHLY executives]?
> A: Oh, I talked to [Maguire], you know, just checked in with him. Made sure he was doing alright in our common deal. There's a certain amount of our conversations that kind of revolve around that bike environment.
> Q: In any of these interactions that you had with him during that time frame, did you ever sense or pick up any type of information or queue [sic] that would suggest that the company was going to be purchased?
> A: <u>I did not</u>.
> Q: Was there any rumors going on that you heard about the company being bought that led you to purchase the stock in July?
> A: <u>No. I knew nothing. I mean there was not a factor.</u>
> Q: And there's no indication from any of the family members, generic or otherwise, to suggest to you to purchase the stock, whether it not be specific about whether you bought out, but any other indications to you that it might be a good time to buy the stock?
> A: <u>If there were, it was so generic that I didn't pick up on it. I mean I did not pick up on anything. I did not recognize any comment that made me take pause to think</u>.

J.A. 52-54 (emphasis in original) (footnote omitted).

1.

A perjury conviction under § 1621 cannot be obtained solely on the uncorroborated testimony of one witness, but must be based on "the testimony of two independent witnesses or by one witness and corroborating evidence." United States v. Neff, 212 F.2d 297, 306 (3d Cir. 1954). Evidence corroborating the testimony of a single witness must be independent of the witness's testimony, trustworthy enough to convince the jury that what the witness said was true, and be "inconsistent with the innocence of the defendant." Id. at 307. To be inconsistent with innocence, corroborating evidence must "merely support the inference that the defendant was lying." United States v. Nessanbaum, 205 F.2d 93, 95 n.4 (3d Cir. 1953).

At trial, the Government offered McGee's high-volume trading in PHLY stock to corroborate Maguire's testimony that he told McGee about PHLY's sale before it was publicly announced. McGee contends that his trading records are not sufficient corroborative evidence. McGee points to United States v. Chestman, in which the Court of Appeals for the Second Circuit reversed a perjury conviction because the evidence of trading was not inconsistent with the defendant's "position that he researched the company, assumed it was a takeover target, and invested accordingly." 903 F.2d 75, 82 (2d Cir. 1990), rev'd on other grounds en banc, 947 F.2d 551 (2d Cir. 1991). McGee argues that, like the defendant in Chestman, his trading records are insufficient corroborative evidence because there are other explanations for his excessive trading.

McGee contends that his trades are congruous with his investment strategy of "averaging down." Averaging down

26

"occurs when an investor . . . buys additional stock at a price lower than the initial investment, which reduces the average price per share of the total investment." McGee, 955 F. Supp. 2d at 472 n.12. McGee contends that because PHLY's stock price at the time of his July trades was lower than the price at which he had previously purchased the stock, his trading was "not inconsistent with his innocence." Appellant's Br. at 46. McGee additionally cites a "historic and significant spike in volume" near the time of his trades, which would encourage increased investor holdings. Id. For these reasons, McGee argues his trading alone fails to independently establish perjury because there were innocent motives for his trades.

We agree with the District Court that McGee's trading records constitute independent corroborating evidence and that "[t]he jury obviously rejected [McGee's averaging-down] argument." McGee, 955 F. Supp. 2d at 472. Unlike in Chestman, in which the defendant's trading was consistent with his position that he researched the company and invested accordingly, McGee's high-volume trades were anomalous and inconsistent with an averaging-down strategy. McGee did not engage in similar trading activity during prior periods of low PHLY stock prices. Yet, in the weeks preceding PHLY's sale, McGee increased his holdings in PHLY from 10 percent of his portfolio on June 30, 2008 to 60 percent by July 23, 2008, the date PHLY's sale was publicly announced. Moreover, there is scant evidence McGee knew about a "historic and significant spike in volume" or that he would increase his holdings in PHLY so appreciably based on such a trading spike. As the District Court held, "[t]he unusual timing and the large number of the shares purchased within a three-week period of time when compared to his previous holdings in PHLY stock, and the significant loan he took to

27

purchase the stock is [sufficient] corroborative evidence." Id. Accordingly, we reject McGee's argument that his trading records do not corroborate Maguire's testimony.

2.

McGee next contends that there was insufficient evidence that his sworn statements were false. McGee first claims that Maguire's inability to recall the precise date he told McGee about the sale demonstrates that McGee's answers denying knowledge of the sale when he traded could have been true. Next, McGee selectively points to specific questions asked of him under oath to show that each is ambiguous and the corresponding answers were literally true. McGee again cannot overcome the "highly deferential" standard of review for sufficiency of evidence as to the falsity of his statements. See Caraballo-Rodriguez, 726 F.3d at 430.

We do not agree that Maguire's testimony was unclear. Maguire plainly testified that he disclosed PHLY's sale before McGee's suspicious July trades. Maguire testified that a week or two after June 21-22, 2008, he attended a weekend golf tournament where he drank. Maguire further testified that right after the golf tournament, he recommended his AA attendance and told McGee about the sale after a meeting. Though Maguire did not point to an exact date, his testimony indicates that he disclosed the information within the first two weeks of July 2008, before McGee's first purchase of PHLY stock on the evening of July 14, 2008. Maguire's testimony therefore directly contradicts McGee's sworn statement before the SEC that he did not have any inside information "prior to making [his] purchases in Philadelphia Consolidated in July of '08." J.A. 52. The jury was free to accept or reject

28

Maguire's testimony, which was not so unclear as to invalidate McGee's perjury conviction.

We reject also McGee's argument that the SEC's questions were ambiguous. "Precise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362 (1973). However, our Court has "eschew[ed] a broad reading of Bronston," noting instead that, "[a]s a general rule, the fact that there is some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statements prosecution." United States v. Reilly, 33 F.3d 1396, 1416 (3d Cir. 1994) (quoting United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir. 1987)).

We agree with the District Court, which held that although some questions were imprecise, they were not so ambiguous that McGee's answers were literally true. McGee was specifically asked, "Did you have any information prior to making your purchases in [PHLY] in July of '08 that there might be something afoot at the company, that there might be something happening with the stock?" J.A. 52. McGee responded, "No." J.A. 52. McGee makes much of the word "afoot," arguing that its implication of mischief or trouble makes his answer literally true. Appellant's Br. at 54. McGee strains to find ambiguity in the question. Read in its entirety, the question asks whether McGee had any information concerning PHLY stock in July. McGee's express denial cannot be characterized as literally true.

McGee's efforts to find ambiguity in other questions are similarly flawed. McGee was asked, "W[ere] there any rumors going on that you heard about [PHLY] being bought that led you to purchase the stock in July?" J.A. 53. McGee

answered, "No. I knew nothing." J.A. 54. McGee was additionally asked, "In any of these interactions [with Maguire] during that time frame, did you ever sense or pick up any type of information . . . that would suggest that the company was going to be purchased?" J.A. 53. McGee answered, "I did not." J.A. 53. McGee argues that the words "rumors" and "sense" relate to gossip and intuition, not whether anyone directly told him about the sale. We do not accept McGee's contrived interpretation of the SEC's questions and determine that McGee's unequivocal answer that he "knew nothing" was clearly false. The questions asked by the SEC were not so ambiguous as to render McGee's answers literally true.

3.

We hold that Maguire's testimony was corroborated and there was sufficient evidence to support the falsity of McGee's statements under oath. Accordingly, we will affirm McGee's perjury conviction.

IV.

Finally, McGee contends that he is entitled to a new trial based on a newly discovered affidavit. We review the denial of a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure for abuse of discretion. United States v. Quiles, 618 F.3d 383, 390 (3d Cir. 2010). Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Five requirements must be met to justify a new trial on the basis of newly discovered evidence:

30

> (a) the evidence must be in fact, newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, [that the evidence] would probably produce an acquittal.

Quiles, 618 F.3d at 388-389 (quoting United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000)). To warrant a new trial based on impeachment evidence, there must be "a factual link between the heart of the witness's testimony at trial and the new evidence" and "[t]his link must suggest directly that the defendant was convicted wrongly." Id. at 392 (citation omitted).

McGee argues that a new trial is warranted based on an affidavit by Tyler D., which came to light during civil discovery after his criminal conviction. He maintains that he was previously unable to find a witness willing to deny that the statement "what you hear here, stays here" was made at the AA meetings he and Maguire attended. Appellant's Br. at 40. McGee contends that this evidence would rebut the existence of a relationship of trust or confidence related to AA and "surely would produce an acquittal." Id.

McGee fails to meet the five requirements for a new trial based on newly discovered evidence. First, he fails to explain what diligence he used to procure Tyler D.'s testimony although he has known Tyler D. and attended AA with him since 2005. Tyler D. actually testified on behalf of McGee at his criminal sentencing, yet McGee fails to clarify why he did not offer Tyler D.'s testimony at trial before

31

sentencing. Additionally, the affidavit does not "suggest directly that the defendant was convicted wrongly" or attack the heart of Maguire's testimony. Quiles 618 F.3d at 392. As noted above, even if confidentiality is not a tenet of AA, Rule 10b5-2(b)(2) requires only a "history, pattern, or practice" of sharing confidences between the two parties. 17 C.F.R. § 240.10b5-2(b)(2). Tyler D.'s affidavit disputing what was said at AA meetings does not undermine Maguire's testimony detailing his confidential relationship with McGee related to sobriety. The District Court therefore acted well within its discretion in holding that the affidavit did not warrant a new trial.

## V.

For the foregoing reasons we will affirm. Rule 10b5-2(b)(2) warrants Chevron deference and is based on a permissible reading of § 10(b). Moreover, a rational juror could find that McGee and Maguire had a relationship of trust or confidence based on their history, pattern or practice of sharing confidences related to sobriety to support a conviction for securities fraud. In addition, there was sufficient evidence to support a perjury conviction, and the District Court did not exceed permissible discretion in denying McGee's motion for a new trial based on newly discovered evidence.

\* \* \* \* \*

The judgment of the District Court will be affirmed.