# United States Court of Appeals
## For the First Circuit

No. 15-2106

UNITED STATES OF AMERICA,

Appellee,

v.

ERIC MCPHAIL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

William J. Cintolo, with whom Thomas R. Kiley, and Cosgrove
Eisenberg & Kiley, PC, were on brief, for appellant.
Andrew E. Lelling, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

July 26, 2016

**KAYATTA**, **Circuit Judge**.    Convicted of committing securities fraud and conspiring to commit securities fraud under 15 U.S.C. §§ 78j(b), 78ff(a), and 18 U.S.C. § 371,  Eric McPhail was neither a corporate insider nor a trader of securities. Rather, he received material, nonpublic information from a corporate insider, and then passed that information along to friends who used the information to obtain substantial trading gains.    Recently, we affirmed the conviction of one of those trading friends.  See United States v. Parigian, No. 15-1994, 2016 WL 3027702 (1st Cir. May 26, 2016).  We now consider McPhail's own conviction following a trial by jury.  For the reasons that follow, we reject McPhail's arguments on appeal and affirm his two-count conviction.

## I.    Background

We summarize the evidence in a light favorable to the jury's verdict, see United States v. Prieto, 812 F.3d 6, 9 (1st Cir. 2016), reserving the detailed treatment of some points for later in this opinion.

The probative bulk of the government's evidence at trial consisted of emails sent to and from McPhail and testimony by Angelo Santamaria, an unindicted individual who served from 2004 to 2011 as an executive at American Superconductor Corporation ("AMSC"), a publicly-traded corporation.  McPhail, a tile salesman by vocation, first met Santamaria in late 2007 at the Oakley

Country Club in Watertown, Massachusetts.  The two men became frequent golf partners and, over the course of about a year, close friends.  Together, they traveled to Florida and Las Vegas on vacation, attended sporting events such as the Kentucky Derby, and gambled at casinos.  They communicated daily and saw one another several times a week.  In May 2009, Santamaria loaned McPhail $6,000 to pay off a gambling debt that McPhail was trying to hide from his wife.  Santamaria later forgave the debt entirely.  When McPhail's divorce jeopardized his spousal membership at the golf club, Santamaria served as McPhail's lead sponsor and successfully lobbied club members to permit McPhail to join as a member in his own right.  In 2010, Santamaria's wife asked McPhail to mediate a marital argument that threatened Santamaria's marriage.

A frequent topic of conversation between the two friends was Santamaria's preoccupation with the performance of his retirement investments, which consisted largely of AMSC stock.  In the course of airing these concerns to McPhail, Santamaria occasionally discussed nonpublic aspects of AMSC's business activities and their potential impact on the company's stock performance. McPhail, for example, learned several days in advance that AMSC was about to lose its biggest customer.  And on another occasion, McPhail had a heads-up that AMSC was on the cusp of signing an important deal that would surely influence the company's stock market valuation.

There is no claim that McPhail himself traded on the information he received from Santamaria. Rather, beginning in July 2009, unbeknownst to Santamaria, McPhail began passing along the upshot of the information he received in these conversations to a set of friends, most of whom were members of a regular golfing group. At trial, the government demonstrated that the lion's share of this tipping occurred via email. For example, on July 23, 2009, McPhail emailed the group:

> AMSC was up another buck today ...I spoke to someone ;) who thinks that there is going to be an announcement on the 29th that will bump the stock significantly followed up with release of earnings on the 30th that will bump it again. Look for 20, 30, 40 percent the middle to end of next week (wednesday and thursday).

All told, the members of the golf group and other friends of McPhail's made nearly $500,000 by executing AMSC trades premised on the tips from McPhail. The government indicted McPhail, singling him out as the scheme's tipper, and a jury convicted him on both counts.

## II. Analysis

The government's case against McPhail is predicated on the "misappropriation" theory of liability for insider trading first recognized by the Supreme Court in United States v. O'Hagan, 521 U.S. 642, 652 (1997). Under this theory, an outsider who owes no duty to a corporation or its shareholders commits the prohibited

"deceit . . . in connection with the purchase or sale of any security," 17 C.F.R. § 240.10b-5(c), by obtaining inside information in confidence and then failing to disclose to the source of the information the fact that the outsider is using the information in breach of a duty of confidence owed to the source, see O'Hagan, 526 U.S. at 652-53. In plain terms, when Sally tells Joe insider information about her corporation, to be held by Joe in confidence, and Joe then trades on that information without telling Sally, Joe is guilty of deception (of Sally) "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5; see Parigian, 2016 WL 3027702, at *3. Such a theory of liability can also apply when the misappropriator does not trade, but instead obtains a benefit by revealing the information to a third person who trades based on the misappropriated information. See, e.g., SEC v. Rocklage, 470 F.3d 1 (1st Cir. 2006).

Within the construct of this misappropriation theory, McPhail trains his appellate argument on three issues: Was the evidence sufficient to show that he knowingly breached a duty of confidence owed to Santamaria? Did the district court's instructions shift the burden of proof or misstate the state of mind element of the securities fraud offense? Did he receive a benefit as a result of his disclosure? We address each issue in turn.

## A. Duty of Trust and Confidence

In O'Hagan, the existence of a duty of confidence owed by the defendant was clear: O'Hagan was a lawyer who traded on nonpublic corporate information he possessed only because the information belonged to a client of his law firm. O'Hagan, 521 U.S. at 647-49. The Supreme Court nevertheless did not confine application of the misappropriation theory to circumstances where insider and misappropriator shared such a formal fiduciary relationship. Rather, it opened the door to circumstances in which an expectation of trust and a reliance on discretion arises outside of a traditional fiduciary setting. See id. at 670 (referring to "a fiduciary or other similar relation[ship] of trust and confidence" (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980)); see also Parigian, 2016 WL 3027702 at *6; United States v. McGee, 763 F.3d 304, 314 (3d Cir. 2014), cert. denied, 135 S. Ct. 1402 (2015)(both discussing O'Hagan's "broad[ ] brush" approach).

In an exercise of its statutory rule-making authority that goes unchallenged by McPhail, the Securities and Exchange Commission ("SEC") followed up on O'Hagan by promulgating a rule in an attempt to "clarify and enhance" the groundwork of misappropriation liability by providing a non-exhaustive list of possible definitions of instances when such a duty might arise. Selective Disclosure and Insider Trading, 64 Fed. Reg. 72,590,

72,590 (proposed Dec. 28, 1999) (codified as amended at 17 C.F.R. § 240.10b5-2).  The rule states that:

> [A] "duty of trust or confidence" exists in the following circumstances, among others:
>
> (1) Whenever a person agrees to maintain information in confidence; or
>
> (2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality[.]

17 C.F.R. § 240.10b5-2(b)(1)-(2).

At trial, the government focused on proving that Santamaria and McPhail shared a "history, pattern, or practice of sharing confidences" such that McPhail knew or "reasonably should [have] know[n]" that Santamaria expected him to avoid sharing the confidential business information with others.  Id. § 240.10b5-2(b)(2).  The jury apparently agreed with this argument. The district court, in turn, rejected McPhail's timely argument that the record contained too little evidence to support a finding that McPhail knew or reasonably should have known that his surreptitious disclosures breached a duty of confidence owed to Santamaria.

We review this preserved challenge to the sufficiency of the evidence de novo, "affirming unless we find that 'no rational

- 7 -

jury could have found [the defendant] guilty beyond a reasonable doubt.'" Prieto, 812 F.3d at 13 (alteration in the original) (quoting United States v. Guerra-Garcia, 336 F.3d 19, 22 (1st Cir. 2003)). Assuming as we must that the jury resolved fairly debatable issues of credibility against McPhail, the evidence that he knew that Santamaria was expecting him to keep the inside information secret is quite strong. Santamaria himself testified that he twice expressly told McPhail "when [he] was in discussion with [McPhail about] what was going on [with the company,] . . . you can never repeat some of this stuff, and he nodded in agreement." Under cross examination, Santamaria was asked, "[B]efore July 2009, did you tell Eric not to repeat anything you told him?" to which he replied, "I have a recollection of twice saying it to him," though he could not identify with certainty the dates on which these conversations occurred. He further testified that, in his memory, one such conversation occurred in the country club's parking lot and another took place at a bar the two men frequented.

While the record is silent as to when exactly Santamaria made these statements to McPhail, the record does contain emails from McPhail from which one can reasonably infer that he had been informed, or otherwise knew, that he was not allowed by Santamaria to pass along the information from the get-go. For example, in July of 2009, McPhail told his buddies "Try this one....AMSC... watch it July 30th." When one of his buddies replied, "[W]hat's

- 8 -

the inside scoop on July 30 Eric?" McPhail replied, "I am not allowed to say....trust me if you want." Thereafter, McPhail began sharing more information, as follows:

> Well boys....went to the Sox game with a friend of mine tonight. He seems to think that AMSC has a $100 Million deal with China that should be signed very shortly. It could be done in the next few days... if it is not done/announced by Thursday, it will not be announced until the week of the 12th because all of China shuts down on vacation for 10 days- starting Friday. This announcement should spike them close to 10%. Furthermore, circle October 29th for the next big day...it could/should be as good as the last one, provided the market cooperates that day.
>
> I like Pinot Noir and love steak....looking forward to getting paid back.
>
> Good Luck....SHHHHHHHHHHHH!!!!!!!!!!!!!!!!!!

In other emails, McPhail expressly recognized that the information "[p]robably will not be released to public for a while, if ever," and that it was "inside info." McPhail's emails referred to "a friend of mine" or "my buddy" or "my friend" or "him" or "someone ;)", never referring to Santamaria by name.

Most tellingly, despite their extremely close friendship and frequent interaction on the golf course, in bars, and at entertainment venues, McPhail never told Santamaria what he was doing with the information. A reasonable jury could easily conclude based on this evidence that McPhail knew that Santamaria was sharing with him in confidence inside information that he

expected was not being shared further, much less for trading AMSC stock.

This is not to say that the case was entirely one-sided. Santamaria's testimony was subject to attack because it materially changed over time. Also, on one occasion, McPhail heard Santamaria tell a third individual known to hold AMSC stock that he hoped that person would "not . . . get hurt" like Santamaria was going to get hurt, perhaps implying that Santamaria expected him to trade on the warning. All of this was grist for the defense's key argument that Santamaria gave "[t]he same general information" to McPhail that he gave to "everybody." The jury, however, was not persuaded. On the whole, we cannot say that the jury was "[ir]rational" because it declined to credit one of McPhail's counter-narratives at trial. Guerra-Garcia, 336 F.3d at 22.

McPhail also argues that the government's evidence was insufficient because it failed to prove that there was an explicit agreement to keep everything quiet--that both parties shared a perfectly symmetrical understanding of the relationship's expectations. McPhail refers to this argument as his "mutuality argument." It is not entirely clear exactly what McPhail means by the term "mutuality." He tells us in his brief that that he uses the term as a "thematic buzzword to frame his defense" that there must exist a "mutual understanding" between the parties to establish the relevant duty. He seems to be saying that nothing

- 10 -

short of evidence of an explicit agreement to keep confidential information confidential can give rise to the kind of duty that qualifies under O'Hagan's framework. That is, merely showing that the recipient of the information knew from the "pattern and practice" of the relationship that the information ought to be kept confidential is not enough.

This argument quickly runs into two formidable legal obstacles. First, it simply reads away the SEC's rule hinging one definition of the trust and confidence relationship on the facts known to the person "to whom [confidential information] is communicated." 17 C.F.R. § 240.10b5-2(b)(2). Hearing from McPhail no argument that the SEC exceeded its statutory authority in including this set of circumstances as one example of such a relationship, we assume without deciding that Rule 10b5-2(b)(2) constitutes a valid exercise of administrative rulemaking. See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

Second, and more fundamentally, McPhail's position is at odds with the basic legal tenets governing the formation of legally cognizable relationships that give rise to mutually enforceable duties. The SEC's rule does no more than reflect the traditional position of agency law that a fiduciary relationship can "evolve[] by implication from the conduct of the parties." CNE Direct, Inc. v. Blackberry Corp., No. 15-1954, 2016 WL 1732762, at *4 (1st Cir.

- 11 -

May 2, 2016) (quoting Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1120 n.13 (Mass. 2000)). Evidence of a "history, pattern, or practice of sharing confidences" between the insider and the misappropriator is nothing more than evidence that a relationship of trust and confidence arose by implication. We see no indication in O'Hagan or Chiarella that these traditional principles are somehow inapplicable when the relationship in question arises outside of a strict, formal business setting. Cf. McGee, 763 F.3d at 314 (holding that "the imposition of a duty to disclose under Rule 10b5-2(b)(2) when parties have a history, pattern or practice of sharing confidences does not conflict with Supreme Court precedent").[1]

McPhail argues, finally, that while the evidence may have showed that he and Santamaria discussed confidential personal information, it did not follow that McPhail knew that Santamaria also expected him to keep the business disclosures secret. The jury, though, was entitled to reject such a proposed boundary on the extent of the two buddies' confidential relationship. Rational jurors could have instead credited the weight of countervailing evidence showing that the exchange of information was part and parcel to the kinds of confidences the two men routinely shared.

---

[1] For the foregoing reasons, we also reject what is, in any event, a perfunctory suggestion in McPhail's brief on appeal that the district court should have said something in its instructions about a "mutuality" requirement.

**B.    Mens Rea**

We turn now to McPhail's state of mind.  McPhail argues, in substance, that even if the evidence supported a finding that a duty of confidence existed and that he knew he was breaching it, the district court did not require that the jury find that he had such an awareness.  Rather, it instructed the jury that it need only find that McPhail "knew or reasonably should have known" that Santamaria expected him to keep the information secret.[2]

McPhail's preservation of this argument has been halting, bordering on waiver.  He actually proposed instructing jurors that a duty of confidence could be inferred from a history of sharing confidences if "the recipient of the information knows or reasonably should know" that he is expected to hold the information in confidence.  At the charge conference, his counsel

---

[2] The relevant jury instructions tracked the language of Rule 10b5-2(b):

> By law, in this case, a relationship in which the defendant has a duty of trust or confidence to Mr. Santamaria could arise under the following circumstances:  One, whenever the defendant has agreed to keep information confidential; or, two, whenever the parties have a history, pattern or practice of sharing confidences such that the recipient of the information knew or reasonably should have known that the person communicating the material, nonpublic information expected that the recipient would maintain its confidentiality.

then told the district court that such a formulation was inconsistent with the statute's language in criminalizing only willful violations of the securities fraud regulations. Counsel asked "I would either ask that you . . . explain what knowingly and willfully means at the time that you use [the 'knew or reasonably should have known' formulation] or excise that portion that says [']should have known[']." Noting that the draft instructions already twice referenced the willfulness requirement, the district court replied, "I think the instructions are appropriate and straightforward on this point. I will read through them, particular[ly] in section [two] with an eye toward how the intent, knowledge, and willfulness instruction is incorporated as to both count [one] and count [two]."

The following day, the district court read instructions that both included willfulness language[3] and stated that:

> [T]he government must prove . . . beyond a reasonable doubt . . . that Mr. McPhail had a duty of trust and confidence to Mr. Santamaria as discussed earlier, and that Mr. McPhail was entrusted with material, nonpublic information that he knew or reasonably should have known he was supposed to keep confidential.

---

[3] "To act 'willfully,'" the court instructed, "means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed, that is to say, with bad purpose, either to disobey or disregard the law, not to act by ignorance, accident or mistake."

At sidebar, the court then asked counsel if there were any objections to the instructions. McPhail's counsel renewed several other objections that he had previously made, but neither renewed nor raised any objections at all to the use of the "knew or reasonably should have known" language.

Then, in his main brief on appeal, McPhail returned his focus to the "knew or reasonably should have known" formulation, this time contending that it "shifted the burden of proof on the question of the existence of a duty of trust and confidence." McPhail's main brief did not even mention the words "scienter" or "mens rea." Not until his reply brief did McPhail return foursquare to his previously abandoned argument that the jury instruction was error because it failed to require that the jury find that he actually "knew" that Santamaria expected him to keep the information secret.

The government argues forfeiture for failure to preserve the argument in the district court. It also argues waiver, both because McPhail's submitted instructions invited the district court to use the now challenged formulation, see United States v. Kakley, 741 F.2d 1, 3 (1st Cir. 1984), and because McPhail failed to raise the issue adequately in his opening brief on appeal.

The waiver argument is close. McPhail did propose the instruction, then he sort of withdrew it, and then, by silence, he arguably made it appear that he still wanted it. McPhail's main

- 15 -

brief on appeal, in turn, only glancingly backs into the issue, highlighting the "knew or reasonably should have known instruction," but never really developing the scienter argument in any direct manner. On the other hand, the government seemed to perceive the argument lurking in McPhail's main brief, as the government included in its main brief a defense of the district court's "scienter requirement," with specific reference to the "knew or should have known" language.

Ultimately, we need not reach the question of waiver. Even assuming no waiver, we find a clear forfeiture, triggering a review for only plain error, which we then find is not present here. We have been unflaggingly clear that to preserve a jury instruction objection, "a litigant must lodge a specific objection and state the grounds for the objection <u>after</u> the court has charged the jury and before the jury begins deliberations," and that "[o]bjections registered during pre-charge hearings are insufficient to preserve the issue." <u>United States</u> v. <u>Roberson</u>, 459 F.3d 39, 45 (1st Cir. 2006). Here, by failing to renew the objection to the "knew or reasonably should have known" language after the instructions were given--especially in light of the district court's conscientious invitation soliciting any and all of counsel's objections for the record--McPhail's attorney failed to preserve the question for de novo review. <u>See</u> <u>Prieto</u>, 812 F.3d at 17. Instead, we review the district court's instruction only

for plain error, the existence of which requires, among other things, a finding that the challenged instruction was "clear or obvious error." United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008).

Our own recent decision in Parigian suggests that the instruction was likely error. See 2016 WL 3027702, at *3-*5. But we have not actually held that it is error, and at least two circuits have expressly blessed the "knew or reasonably should have known" standard. See United States v. Hughes, 505 F.3d 578, 593 (6th Cir. 2007); United States v. Evans, 486 F.3d 315, 324-25 (7th Cir. 2007). The language at issue also appears in the relevant SEC rule routinely applied in civil Rule 10b5 cases, and thus plausibly presents as a presumptively proper candidate for inclusion in the instructions in criminal Rule 10b5 cases when courts are not prompted to consider the different mens rea presumptions applicable to criminal cases. See 17 C.F.R. § 240.10b5-2(b)(2). All in all, the error, if any, here is simply not obvious enough to require that we proceed further with the plain error inquiry. See Henderson v. United States, 133 S. Ct. 1121, 1130 (2013) (to make a successful claim of plain error premised on subsequent change in the law, appellant must show alleged error "plainly" conflicts with a "holding"); United States v. LaPlante, 714 F.3d 641, 644 (1st Cir. 2013) (if one prong of

conjunctive plain error test is not satisfied, "our analysis starts and ends with that prong").

Finally--and somewhat confusingly--McPhail tries out another argument: that the district court's instruction permitting jurors to convict if they found that McPhail should have known, but did not know that he was required to keep the Santamaria information confidential somehow impermissibly shifted the burden of proof from the government to McPhail. In support of this argument, McPhail does little more than rehash his complaints with the court's instructions on the duty of confidentiality, which we have earlier discussed. McPhail points us to no burden-shifting error, much less the obvious error required to successfully advance this new argument. He isolates no remark from the prosecutor or mistake by the district court that would overcome the court's "strong and explicit instructions about the burden of proof, the presumption of innocence, and the fact that the court, not counsel, is the source of the applicable law." United States v. Madsen, 809 F.3d 712, 718 (1st Cir.), cert. denied, 136 S. Ct. 1394 (2016). At no point during McPhail's trial did the burden of proof shift.

## C. Personal Benefit

The Supreme Court has instructed that, in the classical insider trading context,[4] whether a corporate insider has breached

---

[4] "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a

his or her duty in sharing material nonpublic information pivots, in part, on "whether the insider personally will benefit, directly or indirectly, from his disclosure." Dirks v. SEC, 463 U.S. 646, 662 (1983). Assuming that this principle extends to tippers in misappropriation cases, McPhail argues that the government failed to prove that he anticipated a legally recognizable personal benefit in return for sharing the information with his golf buddies. He challenges both the sufficiency of the government's personal benefit evidence and the district court's instructions to jurors regarding what kind of benefit he had to have expected for the crime to have been consummated. McPhail objected on both grounds in district court, and we review the denial of these objections de novo. See United States v. Berríos-Bonilla, 822 F.3d 25, 32 (1st Cir. 2016) (refusal to instruct); Prieto, 812 F.3d at 13 (sufficiency).

The district court instructed jurors on this point at length, but McPhail objects only to the final sentence of those instructions:

> You may find that Mr. McPhail received or expected to receive a direct or indirect benefit from providing inside information to others if you find that he gave the information to others with the intention of benefiting himself in some tangible or intangible way or as a gift with the goal of

corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." O'Hagan, 521 U.S. at 651–52.

- 19 -

> maintaining or furthering a personal
> friendship.

McPhail takes issue with the emphasized "or" above, which permitted the jury to "find that Mr. McPhail received or expected to receive a direct or indirect benefit" if they determined that, at a minimum, "he gave the information to others . . . as a gift with the goal of maintaining or furthering a personal friendship."

This instruction, McPhail argues, amounts to legal error in light of the Second Circuit's recent decision to "adopt[] a more discriminating definition of the benefit to a tipper in a classical insider trading case," Parigian, 2016 WL 3027702, at *8 (citing United States v. Newman, 773 F.3d 438, 452 (2d Cir. 2014), cert. denied, 136 S. Ct. 242 (2015)), and the Supreme Court's more recent grant of certiorari to review the personal benefit question posed by United States v. Salman, 792 F.3d 1087 (9th Cir. 2015), cert. granted in part, 136 S. Ct. 899 (2016).

McPhail is correct that the nature of the personal benefit requirement in insider trading cases is the source of some inter-circuit tension likely to be resolved by the Supreme Court in its next term. But "[h]ow this will all play out, we do not venture to say because, as a three-judge panel, we are bound to follow this circuit's currently controlling precedent." Parigian, 2016 WL 3027702, at *8.

That precedent dictates affirmance: McPhail does not argue that the instruction given by the district court fails to align with the law in this Circuit. We have in the past only entertained the assumption that personal benefit to a tipper need be shown in a misappropriation case, see Rocklage, 470 F.3d at 7 n.4; SEC v. Sargent, 229 F.3d 68, 77 (1st Cir. 2000), and have said that if such a showing is required, it is satisfied by benefits as thin as "reconciliation with [a] friend" and the maintenance of "a useful networking contact," Sargent, 229 F.3d at 77, or "the mere giving of a gift to a relative or friend," Rocklage, 470 F.3d at 7 n.4.

At closing, the government argued that McPhail anticipated receiving two broad types of "personal benefits": "concrete" ones and "more subtle" ones. Among the "concrete" benefits identified at trial were McPhail's expectations that he would receive a free dinner, wine, and a massage parlor visit from the beneficiaries. The government further reminded jurors of evidence that McPhail had given an AMSC stock tip to a close friend that yielded a nearly $200,000 profit, arguing further that McPhail ultimately benefited from a $3,000 "kickback" from that grateful friend.[5] "[M]ore subtl[y]," the government argued, McPhail stood

---

[5] McPhail argues that the tip to his friend was no "gift" and that the $3,000 deposit into his bank account the day after his friend liquidated his AMSC profits was no kickback. But a rational juror could certainly have disagreed.

to benefit from the group's general gratitude for his largesse. Jurors were told: "It makes him one of the guys, they're all kind of impressed."

Under the governing Rocklage and Sargent standards, the cumulative weight of this evidence was surely sufficient to show that McPhail anticipated receiving a personal benefit in return for the tips.  We see no error.

### III. Conclusion

For the foregoing reasons, we affirm McPhail's criminal convictions.