# United States Court of Appeals
## For the First Circuit

Nos. 17-1137
     17-1590

UNITED STATES OF AMERICA,

Appellee,

v.

AMIT KANODIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

    Martin G. Weinberg, with whom Kimberly Homan was on brief for appellant.
    David M. Lieberman, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom John P. Cronan, Acting Assistant Attorney General, William D. Weinreb, Acting United States Attorney, Randall E. Kromm, Assistant United States Attorney, and Brian A. Pérez-Daple, Assistant United States Attorney, were on brief for appellee.

November 22, 2019

**HOWARD**, **Chief Judge**.  A jury convicted Amit Kanodia of insider-trading securities fraud and related conspiracy offenses after a twelve-day trial.  Kanodia challenges the sufficiency of the evidence to sustain his convictions, as well as various jury instructions.  He also appeals the district court's denial of his motion for a new trial.  For the reasons discussed below, we affirm Kanodia's convictions and the denial of his new trial motion.

## I.    Facts

To set the stage for our analysis of the sufficiency challenge, we sketch the facts in a manner hospitable to the jury's verdicts, while leaving some details for later in the opinion. See United States v. Rodríguez-Milián, 820 F.3d 26, 31 (1st Cir. 2016).

In or about 2007, Kanodia, an experienced real estate investor, met Shahana Basu, a U.S.-licensed lawyer living in London, England, through an online dating service.  The two married in April 2008, at which time Basu moved in with Kanodia in Brookline, Massachusetts.  In February 2012, Basu accepted the chief legal officer position at Apollo Tyres ("Apollo") in New Delhi, India.  After Basu moved to New Delhi, Kanodia traveled to India roughly once every two or three months, staying with her for two or three weeks at a time.

In 2013, Basu helped negotiate Apollo's proposed purchase of Cooper Tires ("Cooper"), an American company.  Apollo

sought to use the acquisition to expand into the U.S. market. The rumors of that expansion had been in the financial press since late 2012. Apollo's insider-trading and confidential-information policies covered Basu's work at the company, including her role negotiating the Cooper transaction. Nevertheless, shortly after Basu started at Apollo in the fall of 2012, she began boasting to friends, sometimes in Kanodia's presence, that Apollo brought her on board to orchestrate its acquisition of Cooper.

By early April 2013, Apollo and Cooper preliminarily agreed on Cooper's purchase price. From April through May 2013, Basu resided at the Waldorf Hotel in New York City while conducting Apollo's due diligence on Cooper. Apollo considered the Cooper deal's confidentiality so important that it required Basu and other top executives to disguise their trip to New York to finalize the deal. They did so in part by splitting the trip from India into two legs, with two separate tickets. Kanodia stayed with Basu in her room at the Waldorf for several weeks beginning in early April. During her stay in New York, Basu disclosed to two acquaintances that she was in New York to negotiate Apollo's purchase of a company, in violation of Apollo's confidentiality policy. Both of Basu's disclosures occurred in Kanodia's presence.

Meanwhile, Kanodia disclosed to his two closest friends, Ifthikar Ahmed, a venture capitalist, and Steven Watson, a semi-retired businessman with a Harvard MBA, that Basu was in New York

and that Apollo's purchase of Cooper would go forward. According to Watson, Kanodia chose to provide this information to his "best friends" because, if Kanodia personally traded based on his knowledge of the deal, he would risk getting Basu or himself into trouble. Instead, Kanodia expected that his friends would invest and some of the investment profits would be paid back to him. Kanodia sometimes updated Watson over the phone from Basu's room at the Waldorf. But he generally preferred to speak in-person to avoid detection.

That April, Kanodia told Ahmed and Watson that Apollo planned to purchase Cooper for $35 per share. Both friends bought shares of Cooper, then valued between $24 and $25 per share, in April and May 2013. Ahmed also bought call options in May.[1] The jury heard evidence that Kanodia called the two men shortly before some of their trades in Cooper's securities.

The companies announced the acquisition publicly on June 12, 2013. Kanodia, though, had informed Watson at least five days before about the public announcement. With that information, on

---

[1] A call option is an agreement that permits an investor to purchase a financial instrument at a set price before a certain date. This allows the investor to bet on whether an instrument's market value will increase or decrease without the investor having to pay the instrument's current market price. Thus, an investor can earn a significant profit if the instrument's price changes as the investor predicts, but the investor may lose the entire cost of the options contract if it does not. See First Commodity Corp. of Bos. v. CFTC, 676 F.2d 1, 2 (1st Cir. 1982) (Breyer, J.).

June 7, 2013, Watson purchased call options on Cooper stock that entitled him to buy shares for $30. The options he purchased had an expiration dates of July 20, 2013 or August 17, 2013. On June 10 and 11, Watson purchased additional Cooper call options, which also provided him the right to buy shares at $30 and which expired on August 17, 2013. Ahmed, too, traded in June 2013 prior to the deal's announcement; he also purchased options for $30, and his options expired on June 22, 2013. Additionally, Ahmed bought shares in Cooper during June 2013.

In their June 12, 2013 announcement, the companies disclosed that Apollo planned to purchase Cooper for $35 per share, precisely as Kanodia had tipped his friends. Cooper's share price rose 40% after the announcement, from about $25 to almost $35 per share. Watson made $167,000 in profits from selling his Cooper options and shares, while Ahmed made $1,100,000.

In August 2013, Kanodia created a new bank account for an entity called the Lincoln Charitable Foundation ("LCF"). Shortly after Kanodia opened the account, Ahmed wired $220,000 into it. Watson agreed to pay Kanodia a 25% after-tax commission on his profits and wrote a $22,500 check that was deposited into the LCF account in December 2013.

The FBI interviewed Watson about his trades. After initially telling the FBI that he purchased Cooper securities based on his research into the tire industry, he eventually recanted and

accepted a plea deal in exchange for his cooperation. Kanodia was indicted in May 2015. Ahmed was indicted as well, but he fled the country after his initial appearance. A superseding indictment, filed in June 2015, charged both Kanodia and Ahmed with nineteen counts of insider-trading securities fraud and related conspiracy offenses, in violation of 15 U.S.C. §§ 78j(b), 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 2, 371.

## II.  Trial and Post-Trial Proceedings

At trial, the government alleged that Kanodia's tips to Ahmed and Watson constituted insider trading under the misappropriation theory of insider-trading securities fraud. Under this theory, corporate outsiders violate Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder when they trade on the basis of material, nonpublic information obtained from a corporate insider to whom outsiders owe "a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." Salman v. United States, 137 S. Ct. 420, 423 (2016); 15 U.S.C. §§ 78j(b), 78ff(a); 17 C.F.R. § 240.10b-5. Outsiders who owe insiders a duty not to trade on such "inside information" also violate Section 10(b) and Rule 10b-5 when an outsider (the "tipper") tips another outsider (the "tippee") in exchange for a personal benefit. Salman, 137 S. Ct. at 423.

The government's case included testimony by Watson, by Apollo's chief financial officer, and by the chief operating officer of Ahmed's former employer. Its case also included documents revealing details about Kanodia's travel and the LCF bank account, about Ahmed's and Watson's financial transactions, and about Apollo's plans to acquire Cooper. After the close of the government's case, Kanodia unsuccessfully moved for a judgment of acquittal. Basu, who had gone to India, did not testify.

Kanodia's defense relied on witnesses who testified that Basu had told them about the Apollo-Cooper deal and on testimony by an expert who asserted that Cooper's financial performance indicated that its pre-deal announcement share price understated Cooper's true value. None of these witnesses claimed that Basu had disclosed the deal's price or announcement date. A different witness, Anand Mallipudi, testified that he understood that Basu had disclosed confidential information to him in telling him there were merger talks. Kanodia also introduced various news articles about Apollo's interest in acquiring Cooper. Kanodia renewed his motion for acquittal after presenting his case, which the district court denied.

On October 17, 2016, the jury convicted Kanodia on eleven counts of insider-trading securities fraud related to Ahmed's purchases of options and stock in May and June 2013 and Watson's trades in options in June 2013. The jury acquitted Kanodia for

the two men's other share purchases in April and May.  Kanodia moved for a judgment of acquittal and a new trial, which the district court denied.  In due course, the district court sentenced Kanodia to a substantially below guidelines term of 20 months incarceration.  Kanodia timely appealed.

In February 2017, Kanodia again moved for a new trial based on purportedly newly discovered Indian media reports and witnesses.  The anonymously sourced, mostly Hindi- and Urdu-language reports offered various estimates that were close to the eventual deal price and announcement date.  Kanodia also offered five purportedly newly-discovered witnesses, who averred in affidavits that Basu had told them the deal price and announcement date before the announcement.  The district court denied this new trial motion on the grounds that the reports could have been discovered with due diligence before trial and that the witnesses were cumulative.  Kanodia seasonably appealed both his conviction and that order, and we subsequently consolidated both appeals.

## III. Kanodia's Conviction and the Sufficiency of the Evidence

Kanodia presents two challenges to the sufficiency of the evidence to sustain his convictions.  First, he argues that the jury's verdicts rest on insufficient evidence to show that he owed Basu a duty of trust and confidence.  Alternatively, he contends that the government failed to prove that he violated that duty willfully.  His arguments are unavailing.

## A.    Standard of Review

We review sufficiency-of-the-evidence challenges de novo and construe the trial evidence in the light most favorable to a jury's verdict.  United States v. Franco-Santiago, 681 F.3d 1, 8 (1st Cir. 2012); United States v. Ridolfi, 768 F.3d 57, 59 n.1 (1st Cir. 2014).  Accordingly, we "do not 'assess the credibility' of witnesses because 'that is a role reserved for the jury.'" United States v. Robles-Alvarez, 874 F.3d 46, 50 (1st Cir. 2017) (quoting United States v. Rivera-Donate, 682 F.3d 120, 134–35 (1st Cir. 2012)).  Out of deference to the jury's role, we only upset jury verdicts where "no rational jury could have found the defendant guilty beyond a reasonable doubt."  United States v. McPhail, 831 F.3d 1, 5 (1st Cir. 2016) (internal alterations omitted) (quoting United States v. Prieto, 812 F.3d 6, 13 (1st Cir. 2016)).

## B.    Duty of Trust and Confidence

Because the government prosecuted Kanodia on a misappropriation theory of insider trading, the jury needed to find that Kanodia breached a duty of trust and confidence owed to a corporate insider, namely, Basu.  See McPhail, 831 F.3d at 4. The parties agree that such a duty may arise where the insider and outsider share "a history, pattern, or practice of sharing confidences."  United States v. Parigian, 824 F.3d 5, 14 (1st Cir. 2016) (quoting 17 C.F.R. § 240.10b5-2).  They dispute only whether

the government presented enough evidence for a reasonable jury to conclude that Kanodia shared such a "history, pattern, or practice of sharing confidences" with Basu.

In two prior cases, we have considered what evidence will support a jury finding of a duty based on history, pattern, or practice. In Parigian, we decided that an indictment of a tippee-outsider properly alleged that the tipper-outsider owed such a duty to a corporate insider where the indictment merely asserted that the insider and the tipper were friends who had an understanding that their discussions about business were to remain secret. Id. at 9, 14. A jury later convicted the Parigian tipper at trial, and we affirmed the sufficiency of the evidence in McPhail, 831 F.3d at 7. We held in McPhail that the government had adduced sufficient evidence of a "history, pattern, or practice of sharing confidences," based on testimony from the corporate insider that the insider and tipper were golf partners who spoke daily (often about each other's business), helped each other resolve financial and marital issues, and traveled together. Id. at 3. The insider had also testified that he told the tipper to keep information about the insider's employer confidential. Id. at 5.

While we have not considered the question, other circuits have held that a marital relationship, standing alone, is insufficient to show a history, pattern, or practice of sharing

- 10 -

confidences.  See SEC v. Yun, 327 F.3d 1263, 1272-73 (11th Cir. 2003); United States v. Chestman, 947 F.2d 551, 571 (2d Cir. 1991) (en banc).  We need not resolve that question today, because the jury was not required to rest its findings solely on Kanodia's marriage to Basu.  Indeed, the jury could have credited the wealth of testimony indicating that Kanodia and Basu not only shared confidences in the history of their marriage, but also in their business and career advisory relationships.

For instance, Watson testified that Kanodia had helped Basu obtain employment in Boston.  He further stated that Kanodia introduced Basu to Kanodia's business contacts to help Basu find clients.  And Basu's tips to his friends were a species of confidential business information that the jury could infer were regularly shared by the couple.  Watson acknowledged that Kanodia provided him with the exact offer price and announcement date, and the jury could infer that this information originated with Basu, not the least because Watson testified that Kanodia told him that Basu was working on the deal.  Moreover, the jury could infer that Kanodia, as an entrepreneur with an MBA, was sophisticated enough to know that Basu's disclosures violated her duty of confidentiality to Apollo.  Further, Basu allowed Kanodia access to the confidential papers about the acquisition by allowing him to stay in her Waldorf suite, even though Kanodia's presence created a reportable confidentiality risk.  Consequently, the jury

could conclude that Kanodia knew that information about Apollo was not his to share.

Contrary to Kanodia's claims on appeal that the government introduced little evidence about the nature of their marriage relationship, Watson provided evidence that Kanodia and Basu enjoyed a close relationship. Before Basu's taking the job at Apollo, she lived with Kanodia in Massachusetts. After she left for India, Kanodia frequently flew to India to spend weeks at a time with her. And during their stay at the Waldorf in April and May 2013, the couple socialized with friends together.

Kanodia argues that it is improper to rely on the tips themselves to establish a pattern of sharing confidences; he emphasizes that the duty must have existed prior to the tips. But the jury had before it ample evidence that these disclosures occurred in the context of the pair's previously shared marriage, business activities, and close personal relationship. The jury could reasonably infer that Kanodia and Basu shared a prior history, pattern, or practice of sharing business confidences.

Kanodia also argues that because Basu disclosed her role working on the deal to others, she (and consequently he) did not consider the information confidential. The jury reasonably found otherwise. The trial record shows that Basu merely boasted about her work on the proposed deal in general terms and did not share with those to whom she boasted the specific details as to price

and timing that Watson testified he relied on to trade. Moreover, the jury reasonably could have concluded that she disclosed information with the understanding that her acquaintances would keep the information confidential, an inference supported by Mallipudi's testimony that he "presumed" exactly that. Because the jury could credit Watson and Mallipudi's testimony, sufficient evidence existed to show that Kanodia owed Basu a duty of trust and confidence.

### C. Willful Breach

The evidence similarly suffices to prove Kanodia's willful breach of his duty to Basu.

For Kanodia's convictions to stand, there must be enough evidence to permit a rational jury to infer that Kanodia acted willfully. 15 U.S.C. § 78ff(a); United States v. O'Hagan, 521 U.S. 642, 665-66 (1997). "[I]n order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." Bryan v. United States, 524 U.S. 184, 191-92 (1998) (internal quotations omitted) (quoting Ratzlaf v. United States, 510 U.S. 135, 137 (1994)). Because willfulness is a mental state, only rarely is it proven by direct evidence. United States v. Bank of New Eng., N.A., 821 F.2d 844, 854 (1st Cir. 1987).

Here, the jury heard strong circumstantial evidence showing that Kanodia acted with knowledge that his scheme violated

- 13 -

the law.  In addition to the evidence described above, Kanodia's methods of carrying out his scheme betray a consciousness of wrongdoing.  See United States v. Zanghi, 189 F.3d 71, 81 (1st Cir. 1999) (holding that "evidence of conduct tending to mislead or conceal" permits a jury to infer willfully unlawful conduct). According to Watson, Kanodia attempted to conceal his communications with Watson by avoiding written messages and speaking in vague terms over the telephone.  Watson also testified that Kanodia told him that he could not trade himself.  And, significantly, Kanodia disguised the kickbacks that he received from Ahmed and Watson as purported charitable donations to LCF.

## IV.  Jury Instructions

Kanodia further appeals the district court's decisions to give or refuse to give certain jury instructions.  First, as to a willful blindness instruction given by the trial judge, Kanodia asserts that the instruction lacked a sufficient evidentiary basis.  Second, Kanodia also argues that the district court erroneously denied his requests to instruct the jury that to convict, it needed to find that (1) Ahmed and Watson actually used -- as opposed to merely possessed -- material, nonpublic information when trading in Cooper securities in order to be trading "on the basis of" material, nonpublic information, see O'Hagan, 521 U.S. at 652-53; (2) Basu did not waive Kanodia's duty

- 14 -

of trust and confidence to her; and (3) Kanodia deceived Basu by tipping Ahmed and Watson.  None of these objections merit relief.

## A.    Willful Blindness

We assume, solely arguendo but favorably to Kanodia, that we evaluate de novo the contention that the trial evidence did not support a willful blindness instruction.  Compare United States v. Parker, 872 F.3d 1, 14 (1st Cir. 2017) (reviewing de novo), with United States v. Valbrun, 877 F.3d 440, 445 (1st Cir. 2017) (observing that previous panels have applied abuse-of-discretion review).  The trial evidence warrants a willful blindness instruction if "(1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge."  United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009).

Kanodia only disputes that the evidence satisfies the second requirement:  whether the facts suggest a conscious course of deliberate ignorance.  To meet this element, the government must demonstrate "warning signs that call out for investigation or evidence of deliberate avoidance of knowledge," that is, sufficient "red flags."  United States v. Appolon, 695 F.3d 44, 57 (1st Cir. 2012).  Here, the jury could infer that, as a highly-educated, savvy businessman, Kanodia deliberately avoided investigating red flags indicating that he had a duty of trust and

- 15 -

confidence to Basu which he could not violate.  Information about proposed business mergers is widely understood to be highly valuable and therefore sensitive.  See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988) ("[A] merger in which [a company] is bought out is the most important event that can occur in a small corporation's life." (quoting SEC v. Geon Indus., Inc., 531 F.2d 39, 47–48 (2d Cir. 1976) (Friendly, J.)).  That sensitivity should have been self-evident to Kanodia. Indeed Mallipudi, a friend, not a husband, testified that he "presumed" that Basu's bare disclosures about the existence of Apollo-Cooper merger talks should be kept secret.  Kanodia not only told Watson that Kanodia could not trade on the information because of Basu's job, but also conditioned his tips on Watson kicking him back some of Watson's trading profits.  Based on this evidence, the jury could find that, if Kanodia did not know that he was prohibited from profiting from Watson's trading on the confidential deal details, then his ignorance was willful.

Kanodia offers two rejoinders to this conclusion. First, he argues that evidence about "Basu's unilateral expectations" of confidentiality lacks probative value because Basu's disclosures to other businesspeople occurred in Kanodia's presence.  His objection is misplaced.  The trial record does not show that Basu disclosed the offer price or the announcement date to her business acquaintances.  Further, her general boasts about

- 16 -

her playing a role in the merger talks alerted at least Mallipudi to the confidential nature of the information. Second, Kanodia points to the purported differences in "business cultures" between India and the United States. But Kanodia cites no trial evidence in support of this factual proposition. And assuming that those differences do in fact exist, both Kanodia and Basu had extensive business experience in the United States and both had earned American professional degrees. Kanodia was thus well-equipped to navigate any purported differences between American and Indian business cultures. The trial record contained sufficient warning signs to justify a willful blindness instruction.

Even if the willful blindness instruction were unjustified, the error would have been harmless because the government presented sufficient evidence that Kanodia actually knew that his tips violated the law. See United States v. Fermin, 771 F.3d 71, 79 (1st Cir. 2014). Among other facts, Kanodia's statements that he could not trade himself, his directions to send money to LCF, and his business experience all provide sufficient grounds for the jury to infer Kanodia's actual knowledge of his disclosure's unlawfulness.[2] There was no reversible error in the district court's willful blindness instruction.

---

[2] Furthermore, it is not at all likely that the jury convicted Kanodia on a theory of negligence or recklessness. See United States v. Littlefield, 840 F.2d 143, 148 n.3 (1st Cir. 1988) (identifying the harm from an improvidently given willful

## B.    "On the Basis of" Instruction

Turning next to Kanodia's claims of error regarding the rejection of his preferred instructions, Kanodia asserts that the district court improperly instructed the jury on the definition of trading "on the basis of" material, nonpublic information. See O'Hagan, 521 U.S. at 652-53. We review de novo whether the district court's instruction correctly stated the law. United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013). Nevertheless, we will not disturb a verdict, notwithstanding a legally incorrect instruction, if the instructional error was harmless. See United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). Our inquiry is not "whether there was enough to support the result" but "whether the error itself had substantial influence" on the jury's verdict. Kotteakos v. United States, 328 U.S. 750, 765 (1946).[3] This case presents no need for us to fully

---

blindness instruction as the jury mistakenly convicting the defendant on a negligence theory).

[3] Kanodia's reply brief characterizes his objection to this instruction as relating to due process. Appellants suffering a constitutional error, as opposed to a trial error, are entitled to reversal unless the court can "declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Even though Kanodia's reply brief suggests that the instruction violates the Fifth Amendment by creating a mandatory presumption, his initial brief argues that the instruction erroneously interprets Section 10(b) of the Exchange Act. We thus apply Kotteakos's standard here. See Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983) (holding that claims not raised in the appellant's initial brief are waived).

resolve how to determine whether a trade is "on the basis of" material, nonpublic information, however, for even if the government must show that the tippee used the information to convict a tipper, Kanodia's conviction would stand.

### 1. The District Court's Instruction

The district court instructed the jury that, to show that a trade was on the basis of material, nonpublic information, "[a]ll that is required is that [Ahmed and Watson] were in possession of the material non-public information at the time that they traded." Kanodia disputed that Ahmed and Watson's mere possession of confidential information sufficed; he insisted that the government must prove that they actually used the tips to trade. Specifically, Kanodia requested the jury be instructed that the government needed to prove beyond a reasonable doubt that Ahmed or Watson:

> placed trades in Cooper securities on the basis of material, non-public information received from Mr. Kanodia in violation of Mr. Kanodia's fiduciary or confidentiality duties owed to Ms. Basu. For trades to be on the basis of material, non-public information, you must find that Mr. Watson and/or Mr. Ahmed were in possession of confidential material, non-public information and used that information in consummating their transactions. . . .

The district court denied Kanodia's request, and Kanodia objected to the district court's failure to instruct the jury that the

material non-public information needed to have been both possessed and used to support conviction.[4]

## 2.    If There Was Any Error, It Was Harmless

The government introduced more than enough evidence as to use to sustain Kanodia's conviction.  Watson testified that he relied on Kanodia's tips to trade.  Kanodia sometimes placed phone calls to both men shortly before they traded.  Ahmed and Watson invested heavily in Cooper as Kanodia continued to feed them information.  Moreover, they bought options that would have proven worthless if Cooper's share price did not jump quickly.  And both transferred a combined sum of $242,500 to the LCF account controlled by Kanodia after profiting handsomely on their trades.

Although the government opposed Kanodia's requested instruction, it refrained from suggesting that Ahmed and Watson's mere possession of Kanodia's tips sufficed to show Kanodia's culpability.  Accordingly, any instructional error did not have a substantial influence on the jury's verdict.

---

[4]    Kanodia renews this objection on appeal, but we bypass it.  The government argues that the district court instruction was properly based upon the SEC's interpretation of Section 10(b) in Rule 10b5-1 (which the government argues deserves Chevron deference).  See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  We need not address this issue, because any error was harmless.

## C.    Waiver of Duty

Kanodia also contests the district court's refusal to instruct the jury that it must find that Basu did not waive Kanodia's duty of trust and confidence to her.  Kanodia's briefing is unclear whether he is asserting that this omission constitutes a failure to instruct the jury as to all the elements of the charged offense or to give a required theory-of-the-defense instruction.   It appears that at trial Kanodia requested an instruction that the government had to prove that Basu did not waive Kanodia's duty as an element of the offense.  On appeal, Kanodia appears to shift tactics, framing his argument at some points as a request for a theory-of-the-defense instruction and at others for an elements instruction.  Whether Kanodia requested an elements or theory-of-defense instruction -- and thus regardless of whether de novo or plain error review applies -- his argument fails.  McDonough, 727 F.3d at 156 (elements of offense); United States v. Peake, 804 F.3d 81, 98 (1st Cir. 2015) (theory of the defense).  The failure to give a requested theory-of-the-defense instruction triggers reversal only if the instruction was "(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense."  United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013).

- 21 -

While Kanodia's duty was "integral to an important point in the case," Kanodia's requested instruction was incorrect as a matter of law.  Peake, 804 F.3d at 98.  Kanodia does not claim that any court has required the government to prove that the insider did not explicitly waive an outsider's duty of trust and confidence in order to sustain an insider trading conviction.  See McPhail, 831 F.3d at 6 (holding that an insider's disclosures to individuals other than the defendant-outsider might show the nonexistence of a duty).  The insider cannot waive the duty, and, to the extent Basu's knowledge of disclosures might go to the nonexistence of a duty, the district court's instruction "substantially covered" the applicable theory.  Kanodia, like the tipper in McPhail, could -- and did -- argue that Basu's disclosures defeated any duty of confidentiality he owed to her. Unfortunately for Kanodia, a reasonable jury could have found such a theory implausible, for, among other reasons, Kanodia received much more specific and sensitive disclosures than the outsiders who testified at trial.  Accordingly, the district court did not err in refusing to give Kanodia's waiver instruction.

## D.  Deception

Kanodia's final claim of instructional error faults the district court for failing to focus the jury's attention on whether he deceived Basu.  Here again, Kanodia does not clearly indicate whether he believes that the district court omitted elements of

the offense or wrongly declined to give a theory-of-the-defense instruction. Framed either way, his argument is unpersuasive.

Kanodia principally relies on the O'Hagan Court's statement that "if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation." 521 U.S. at 655 (quoting 15 U.S.C. § 78j(b)). But this statement does not establish the deception of the person to whom the misappropriator owed a duty is an element of the offense.

More importantly, the breach of the duty of trust and confidence itself has long been held to be the deceptive device that the government must prove. See id. at 652 ("[A] person commits fraud in connection with a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." (internal quotation marks omitted)). The O'Hagan Court simply stated that no breach of a duty occurs when the evidence tends to show that an insider allowed an outsider to share the insider's confidential information. It did not require the government to prove a negative, and Kanodia does not identify any precedent doing so either. Thus, insofar as Kanodia purports to raise an objection based on the district court's failure to state the offense's elements, the objection is off-base.

Even interpreted as an objection based on the district court's failure to grant him a theory-of-the-defense instruction, Kanodia's challenge still fails. He could have argued that Basu knew about his disclosures even with the district court's instructions.

## V.    New Trial Motion

Kanodia's strongest contention is that the district court erred in denying his motion for a new trial. Our deferential standard of review compels us to affirm.

### A.    Standard of Review

We review a district court's denial of a Rule 33 motion for a new trial on the basis of newly discovered evidence for manifest abuse of discretion. United States v. Turner, 501 F.3d 59, 73 (1st Cir. 2007). We will order a new trial on the basis of newly discovered evidence only if:

> (i) the evidence upon which the defendant relies was unknown or unavailable to him at the time of trial; (ii) the failure to bring the evidence forward at trial was not occasioned by a lack of diligence on the defendant's part; (iii) the evidence is material (as opposed to being merely cumulative or impeaching); and (iv) the evidence is such that its introduction would probably result in an acquittal upon a retrial of the case.

United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007) (citing United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980)); Fed. R. Crim. P. 33(a). For our analysis in this case, we

group the first two and the latter two elements together. See Maldonado-Rivera, 489 F.3d at 66.

Here, the district court denied Kanodia's new trial motion, reasoning that the reports could have been discovered with due diligence before trial and that the witnesses were cumulative.

## B.  Due Diligence

Kanodia argues that his proffered media reports and five witnesses are "newly discovered," and that his failure to introduce them at trial was not caused by a lack of due diligence. "[D]ue diligence [is] 'a context-specific concept' generally akin to the degree of diligence a reasonably prudent person would exercise in tending to important affairs." United States v. García-Álvarez, 541 F.3d 8, 18 (1st Cir. 2008) (quoting Maldonado-Rivera, 489 F.3d at 69). Moreover, whether a party exercised due diligence "[depends] upon the nature of the evidence in question." United States v. Hernández-Rodríguez, 443 F.3d 138, 144 (1st Cir. 2006). But "[w]here . . . the newly proffered evidence all pertains to a matter that the defendant knew would be in issue at his trial, and the source of that evidence was an obvious one, the district court ha[s] every right to deem the requirement of due diligence unsatisfied." Maldonado-Rivera, 489 F.3d at 69.

Here, both the press's purportedly detailed coverage and the Indian business community's knowledge of the Apollo-Cooper merger talks constituted Kanodia's key trial defenses. As a

- 25 -

consequence, a reasonably prudent person pursuing this line of defense would have looked into a variety of Indian media sources, including some non-English language publications. Nevertheless, Kanodia consciously chose not to research non-English language publications. That such sources existed would have been obvious to Kanodia. See García-Álvarez, 541 F.3d at 18. What's more, three of the fifty-nine articles Kanodia seeks to introduce are in English, and twenty-one (including all of the English language articles) were published online prior to the trial. As a result, Kanodia has not carried his burden of showing that the district court manifestly abused its discretion in excluding these reports.[5]

Next, Kanodia claims to have identified five newly discovered witnesses. One witness, Inderjit Singh, however, was known to Kanodia before trial, and we therefore decline to consider his affidavit. Kanodia had met Singh in April 2013 and had general knowledge of his potential testimony. Kanodia insists that he omitted Singh from his witness list because he was unavailable. Singh told Kanodia's private investigator that he had symptoms of an undiagnosed heart problem in "late September 2016." Yet he was not hospitalized until October 12, 2016, and Kanodia had already filed his witness list on September 19, 2016. Moreover, Kanodia did not depose Singh. This chronology and the concomitant failure

_____

[5] In any event, the newly proffered articles do not disclose the detailed information that Kanodia obtained from Basu.

- 26 -

to take steps to preserve Singh's testimony means the district court did not abuse its discretion in finding that Singh did not qualify as a newly discovered witness.

### C.    Materiality

That leaves us to consider the other four proposed new witnesses, Jamaluddin Ahmed, Raji George, Sanjay Kumar, and Vivek Singh.  The government argues that the district court permissibly found these witnesses provide cumulative, not material, evidence. We agree.  Because "the district court 'has a special sense of the ebb and flow of the . . . trial[,]' . . . . we afford substantial deference to the district court's views regarding the likely impact of belatedly disclosed evidence."  United States v. Peake, 874 F.3d 65, 70 (1st Cir. 2017) (first alteration in original) (citing United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010)).

These four witnesses' affidavits purport to fill a gap in Kanodia's trial defense: although Kanodia showed that Basu had been loose-lipped about her work on Apollo's acquisition of Cooper, he failed to show that she had disclosed the deal's price and the announcement date to other outsiders.  Three new witnesses, George, Kumar, and Vivek Singh, would testify that Basu told them the deal price and the announcement month.  Kumar also would testify that many in the New Delhi business community knew the deal price and announcement months in advance.

- 27 -

In light of the deferential standard of review, however, we must credit the many conceivable reasons supporting the district court's holding. First, Jamaluddin Ahmed, a journalist, does not assert in his affidavit that he spoke to Basu and instead only repeats rumors that he heard. The district court could have determined that testimony as to unsourced gossip was insufficiently reliable to affect the verdict. See United States v. Contorinis, 692 F.3d 136, 144 (2d Cir. 2012) (positing that confirmation of information by a corporate insider may be material because "[r]umors or press reports about the transaction may be circulating but are difficult to evaluate because their source may be unknown"). Additionally, such testimony would be cumulative because of the many published news articles that Kanodia introduced at his defense at trial. Accordingly, the district court did not manifestly abuse its discretion in ruling that Ahmed's testimony was cumulative.

Second, George's affidavit indicates that he did not speak with Basu in close temporal proximity to the May and June trades for which the jury convicted Kanodia. He claims to have spoken to Basu in April, months before the deal would be announced. Basu's earlier disclosure would have lacked the certainty of Kanodia's tips in May and June. See Basic, 485 U.S. at 238-41 (reasoning that the more certain it is that a merger will occur,

- 28 -

the more likely it is that information about a proposed merger is material).

That leaves Kumar's and Vivek Singh's proposed testimony. Kumar's affidavit states that he met Basu "around the first week of June 2013 . . . [w]here she stated that . . . Apollo Tyre is buying Cooper Tire of USA and the deal is valued around 2.5 billion USD and will close very shortly." Vivek Singh avers in his affidavit that he also met Basu in "early June 2013" and that she told him that negotiations for Apollo to purchase Cooper for $2.5 billion were "in advance state and the deal will be through within few weeks [sic]."

The district court did not manifestly abuse its discretion in denying the new trial motion based on these two new witnesses. Kumar qualifies all of his proposed testimony regarding the key details ("around 2.5 billion USD" and "very shortly"), and Vivek Singh's testimony is similarly vague as to the timing ("advance state").

Further, if these details were made as public as the affidavits claim, the opportunity to so profitably trade on the widely known information would not have existed. See Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 272 (2014) ("[M]arket professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." (quoting Basic, 485 U.S. at 246 n.24)) If

the information discussed in the affidavits were public (even if only public in India), Cooper's share price would have reflected this information.  Yet it did not -- as Kanodia admits, the price "remained relatively stable" for the first six months of 2013 -- so Watson was able to place highly profitable trades even on the day before the deal's announcement.  This stability obtained even amidst rumors dating back to late 2012 that Apollo might buy Cooper.  The fact that Basu bragged about her role to others was a fact already in evidence and was not a basis for a new trial. The district court did not manifestly abuse its discretion in denying Kanodia's motion for a new trial.

## VI.  Conclusion

For the foregoing reasons, we **AFFIRM** Kanodia's convictions and the denial of his new trial motion.